ERIC G. YOUNG, ESQ. (SBN 190104)
**YOUNG LAW GROUP**
411 Russell Avenue, Second Floor
Santa Rosa, California 95403
Tel.: 707.527.3637
Fax: 707.520.7272
Email: eyoung@younglawca.com

Attorneys for Plaintiff
RONALD CUPP

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD CUPP,<br><br>      Plaintiff,<br><br>      vs.<br><br>ANDREW SMITH; et al.,<br><br>      Defendants. | CASE NO. 4:20-cv-03456PJH<br><br>**DECLARATION OF PLAINTIFF RONALD CUPP IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR PARTIAL SUMMARY JUDGMENT**<br><br>Date: February 3, 2022<br>Time: 1:30 p.m.<br>Dept.: Courtroom 3, 3rd Floor<br>Judge: Hon. Phyllis J. Hamilton |

I, RONALD CUPP, declare:

1. I am over the age of 18 years, and I am the Plaintiff in this action. If called upon, I could and would competently testify to the matters stated herein from my own personal knowledge, except for those matters which are stated on information and belief. As to those matters, I believe them to be true.

2. On February 15, 2019, I was the legal owner of a parcel of real property located at 4640 Arlington Avenue, Santa Rosa, California in the County of Sonoma. I purchased the property in 1989. My brother, Randall Cupp, occupied the single family residence from



DocuSign Envelope ID: 934A74BF-5603-4B30-A288-1082ECG3F441

1989-2013. A foreclosure action was filed against me in 2013, which I successfully defended. This resulted in a court-approved settlement agreement, effective December 12, 2018, with Federal Mortgage Association ("Fannie Mae") wherein I was allowed to "buy back" the property through a program offered by Fannie Mae. Attached hereto as ***Exhibit "A,"*** and incorporated herein by this reference, is a true and correct copy of the settlement agreement I signed with Fannie Mae on December 14, 2018.

3. I satisfied my obligations under the settlement agreement and bought back the property. Fannie Mae executed and delivered a quitclaim deed to me on or shortly after January 24, 2019. Attached hereto as ***Exhibit "B,"*** and incorporated herein by this reference, is a true and correct copy of the quitclaim deed I received from Fannie Mae, which I produced to the defense in response to a request for production of documents.

4. The Sonoma County Recorder would not record this quitclaim deed. The deed was redrawn, executed again, and delivered to me on or about February 25, 2019. I had already retaken possession of the property on or about January 10, 2019 and was occupying an upstairs bedroom in the single family residence located at the property. Attached hereto as ***Exhibit "C,"*** and incorporated herein by this reference, is a true and correct copy of the recorded deed I received.

5. The Arlington Avenue property is a 4.33-acre parcel located in a mostly rural setting outside the city limits of the City of Santa Rosa; however, the property is not used as farmland. The property is accessible only by a dead-end road that becomes a private road just before it reaches the northwest corner of the property and the western property line, which abuts Arlington Avenue.

6. In years past, the point where the private road begins was marked by an access gate that has since been removed, but the point where the road becomes a private road is



DocuSign Envelope ID: 934A74BF-5603-4B30-A288-1082ECG3F441

still visible to anyone who comes down the road today because the County-maintained asphalt ends at that point. There is also a road sign that I am informed and believe the County posted which says, "End." Attached hereto as **_Exhibit "D,"_** and incorporated herein by this reference, is a true and correct copy of a photograph from Google Earth showing the private road and "End" sign. The property is otherwise landlocked on three sides by other properties.

7. The Arlington Avenue property has several structures located on it, including the two-story, single family residence where I resided on February 15, 2019, an awning structure located approximately 19-20 feet from the western side of the residence, and a 484 square feet, converted detached garage/"granny unit" located approximately 25 feet from the southwest corner of the residence. The granny unit had already been converted to an additional living space at the property by February 15, 2019.

8. The granny unit appears to have a garage door facing onto Arlington Avenue, but this is a false door, only trimmed to look like a garage door. There are only two doors that provide entrance to the granny unit. On the south side, there is a 3 feet wide door near the southeastern corner of the granny unit that is approximately 30 feet beyond where the western property line; the other door is located at the north side of the granny unit within the property line. Neither door faces onto Arlington Avenue, and neither do any windows of the granny unit. Attached hereto as **_Exhibit "E,"_** and incorporated herein by this reference, are true and correct copies of photographs of the "granny unit," which were produced as photographs taken by Officer Smith on February 15, 2019.

9. The door on the south side of the granny unit is a solid door that opens inward. The interior of the granny unit would not be visible from Arlington Avenue even if this door was open on February 15, 2019. The door itself and fencing around the property



would conceal the interior of the granny unit. The only way to see the interior of the granny unit would be to enter upon my property. It is approximately 30 feet from the western property line abutting Arlington Avenue to the center of the south door of the granny unit.

10. In addition to these structures, a row of barns runs nearly the length of the southeast side of the property. I once used these structures as a workshop and for equipment storage.

11. There has always been privacy fencing and no trespassing signs posted at the Arlington Avenue property. When my brother, Randall, lived in the residence, he kept Rottweilers, so he constructed a 5' tall, interior fence around the residence to keep the dogs in. In 2010, one of the dogs jumped over the interior fence and escaped. Randall then constructed a fence around the residence that was 6'8" tall. That fence ran north to south on the west side of the residence, which, again, is the side facing Arlington Avenue, and east to west along the south side of the residence. *See,* Randall Cupp Dec., submitted herewith.

12. There was also an existing 7-feet tall, solid wooden, exterior privacy fence enclosing the west side of the property. The existing fence had been in place for more than 25 years. By the time I retook possession of the property from Fannie Mae in January 2019, the existing, exterior privacy fence at the property was in disrepair and needed to be replaced. I began installing a solid wooden privacy fence along the entire western edge of the property, along the same fence line as the existing, exterior fence. The fence encloses both the residence and blocks access to the granny unit. The fence line running the entire length of the western side (or, Arlington Avenue side) of the property was, and is, 93 inches in height, giving privacy and protection to me at the property. All but one 8-feet-



wide section of this fence on the south side of the granny unit was completed by February 15, 2019.

13. Based on Officer Smith's deposition, at which I was personally present and listened to his testimony, I am informed and believe the 8-feet wide gap in the fence is the spot he walked through when he first entered my property to approach the door on the south side of the granny unit on February 15, 2019. This opening was not a gate, and it is not the path of travel to access either the residence or the granny unit.

14. The path of travel to the residence and the granny unit is a gate on the northwest corner of the granny unit, where on February 15, 2019, there was also a short section of 74-inch tall, solid wooden fence and a gate of the same height and style. See, David Harris Dec., Exh. C. photographs. This has been the path of travel to the residence and the granny unit for 30 years because there is also a concrete path leading to the residence located there.

15. Whenever a FedEx delivery person or mail carrier had a package to deliver, they would leave the packages at the fence or gate because they knew the property had dogs on it. In addition, except for the brief period when the exterior fence was being replaced, the property was posted with warning signs saying "No Trespassing – Keep Out." I sent copies of these posting by certified mail to various officials at Sonoma County in 2013, which I explain further below.

16. On the northern side of the property, there is also an 8-feet tall, solid wooden fence. On the southern edge of the property, some distance from the residence, is a "wire and wood" style fence that is 5-6 feet tall that was already in place on February 15, 2019. On the eastern side of the property is a "post and wire" fence. Attached hereto as ***Exhibit "F,"*** and incorporated herein by this reference, is a true and correct copy of a photograph



taken by Officer Smith on February 15, 2019 and produced in discovery, which was taken from the southwest corner of the property showing that the solid wood fence extends the entire length of the western edge of the property along Arlington Avenue to connect with the lower fence on the southern side of the property.

17. The significance of this is that the property is completely fenced on all four sides. It is landlocked by other properties on all sides but the west side facing Arlington Avenue. I was not using the property as farmland on February 15, 2019. The property is not an open field.

18. Attached hereto as ***Exhibit "G,"*** and incorporated herein by this reference, are true and correct copies of additional photographs Officer Smith states he took on February 15, 2019 and which he produced in discovery. The photographs referenced in this Declaration as Officer Smith's photographs and attached as exhibits were also exhibits to Officer Smith's deposition, the first part of which I took on July 22, 2021 when I represented myself. The photograph Officer Smith took from the doorway of the granny unit while on the property is the photograph marked as Exhibit 10 to Officer Smith's deposition.

19. On February 15, 2019, I had a worker at the property, Daniel St. Clair, who was doing work while I went out running errands. I hired him to paint the interior of the granny unit, replace a door, install vinyl flooring, and do some interior trim work on the granny unit. I was a licensed contractor was 30 years. I operated my own construction businesses from approximately 1985-2008, and in that capacity, I had many occasions to obtain permits for customers. No one was living in the granny unit on February 15, 2019. The work St. Clair was doing on February 15, 2019 did not require any permits.



20. Prior to the February 15, 2019 inspection, I had communicated with Sonoma County in writing about my private property rights at the Arlington Avenue property. On April 18, 2013, I notified the County and other government officials by certified mail that I asserted U.S. land patent and other property and privacy rights over the Arlington Avenue property, which included sending the County copies of 14 posted notices of no trespassing signs that were also posted on the exterior privacy fence at the property. *See, King Dec., Exh. 4, Plaintiff's First Amended Complaint, Exh. B.*

21. Back in 2013, the County considered these mailings to be a government claim. The County issued a Notice of Insufficient Claim to me dated May 7, 2013 and then a Notice of Rejection of Claim on June 11, 2013. *See, King Dec., Exh. 4, Plaintiff's First Amended Complaint, Exh. B.*

22. On February 20, 2019, after Officer Smith entered the Arlington Avenue property, I mailed a letter by certified mail to Officer Smith at his County work address. I also mailed the same certified letter to Tennis Wick, the Director of Permit Resources & Management Dept. for Sonoma County, where Officer Smith works, to the Sonoma County Board of Supervisors, and to the County's Risk Management Dept. *See, King Dec., Exh. 13.* I freely admit my letter may not be an example of perfect writing. I made a typo with the date next to my signature on the letter. It should read February 20, 2019, not 2018, and there are misspelled words. I did not have advice or assistance of counsel in preparing this letter. Regardless, I was making a claim against the County of Sonoma for Officer's Smith's actions on February 15, 2019. I described what happened, when it happened, where it happened, characterized Officer Smith's actions as a "trespass" and a "tort," and stated that I wanted a resolution.

23. I never received any notification or communication from the County replying that my letter was insufficient as a government claim, or that they needed further information from me. When I submitted the claim form on October 23, 2019, I filled out the form myself and submitted it in person because the County had subsequently recorded an abatement lien against my property. At that time, I had been advised it would be better to use the County's official form rather than write another letter. I did not have legal counsel assist me in filling out the October claim form either.

24. Attached hereto as **Exhibit "H,"** and incorporated herein, are excerpts from Officer Smith's deposition that I took on July 22, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 31, 2021

DocuSigned by:

*Ronald Cupp*

E7C384DC57DC48A...

RONALD CUPP, Declarant



# EXHIBIT "A"

## *Cupp v. Smith*

### *4:20-cv-03456PJH*

Effective December 12, 2018 (the "Effective Date"), Fannie Mae agrees to transfer 4640 ARLINGTON AVE, SANTA ROSA CA 95407 (the "Property") to RONALD CUPP (the "Purchaser") on the following terms:

1. The sales price for the property shall be $307,242.29 (the "Sales Price"). Within 10 days after the Effective Date, the Purchaser shall deliver to Fannie Mae's attorney (i) this agreement signed by Purchaser and (ii) a 10% **NONREFUNDABLE** deposit in the amount of $30,724.23. The 10% nonrefundable deposit must be in the form of certified funds **payable to Fannie Mae.**

2. Within 30 days from the Effective Date, Purchaser shall deliver to Fannie Mae's attorney the remaining amount owed to satisfy the Sales Price (*i.e.*, the Sales Price minus the 10% nonrefundable deposit). The Sales Price must be paid in the form of certified funds **payable to Fannie Mae.**

3. Upon receipt of the entire Sales Price, Fannie Mae shall provide a Quit Claim Deed for the Property to the Purchaser. The transfer of the Property shall be on an "as is" basis, without any representation or warranty. Purchaser shall be responsible for all taxes, fees, costs, or other expenses relating to the transfer of the Property. Purchaser shall be responsible for all past, present, and future taxes, liens, utilities, or assessments on the Property. Fannie Mae will not pay any fees or costs incidental to the transfer of the Property.

4. In the event Purchaser fails to comply with any of the requirements in paragraphs 1-3 (including but not limited to the failure to deliver the 10% nonrefundable deposit to Fannie Mae within 10 days), Fannie Mae shall have no further obligations under this agreement, and Fannie Mae shall be entitled to retain the 10% NONREFUNDABLE deposit if made by the Purchaser.

5. Nothing herein shall prohibit Fannie Mae from proceeding with an eviction, but Fannie Mae shall not execute on any judgment before the expiration of the time frames in this signed agreement provided that Purchaser is in full compliance with all of the requirements set forth in paragraphs 1-3.

6. In the event Fannie Mae determines in its sole discretion that it does not have title to the Property, Fannie Mae may terminate this agreement. In the event Fannie Mae terminates this agreement under this paragraph, Fannie Mae shall return any funds Purchaser paid to Fannie Mae under this agreement.

7. Upon Fannie Mae's transfer of the Property pursuant to paragraph 3, Purchaser hereby releases and discharges Fannie Mae, its servicers, representatives, agents, attorneys, officers, directors, employees, successors and assigns (collectively the "Released Parties") from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, claims, demands and liabilities whatsoever of any type that Purchaser now has or ever has had to this date against the Released Parties.

CUPP000029

8.      Purchaser represents and warrants that this agreement contains all terms relating to the sale of the Property; that the Released Parties have not made any representations relating to the sale of the Property, and that Purchaser has entered into this agreement in his/her sole discretion and is not relying on any representation by the Released Parties apart from what is written in this agreement.

9.      This agreement shall be governed by the laws of the State of Texas.

If you agree to the above terms, sign and date in the space provided below and return to Fannie Mae. In the event this agreement is not signed by you and returned to Fannie Mae's attorney within 10 days of the Effective Date, this agreement shall be null and void without any further notice or action.

Purchaser – Ronald Cupp

12-14-18

Date

CUPP000030

CLTA Standard Coverage - 1973

**SCHEDULE C**

The land referred to in this policy is situated in the County of _____ Sonoma, _____ State of California, and is described as follows:

FARMS 234, 235 and 236, as numbered and designated upon the Plan of Subdivision of Santa Rosa Farms No. 3, Sonoma County, California, recorded in the Office of the County Recorder of Sonoma County, California, on October 9, 1911 in Liber 26 of Maps, page 15.

ALSO, that part of Lot 232, described as commencing at the southwesterly corner of said Lot; thence North 1° 31' West, along the dividing line between Lots 232, 234 and 235, a distance of 677.87 feet to the southerly line of that certain tract under Agreement of Sale made by Harvey W. Burson and Bertha Lillian Bode, by Agreement dated August 30, 1934 and recorded in Liber 368 of Official Records, Page 265; thence along the Southerly line of said Bode, North 89° 28' East, 9 feet; thence South 1° 31' East, 677.98 feet to the Southerly line of Lot 232; thence along the Southerly line of said Lot South 89° 28' West, 9 feet to the point of commencement

EXCEPTING therefrom that portion contained in the Deed from Warren T. Pritchard and Dorothy L. Pritchard, his wife, to Peter A. Zarins, a married man and John T. Zarins, an unmarried man, dated February 1, 1965 and recorded February 24, 1965 in Liber 2109 of Official Records, page 923, Recorder's Serial No. J-31630, Sonoma County Records.

ALSO EXCEPTING therefrom that portion contained in the Deed from Warren T. Pritchard and Dorothy L. Pritchard, his wife, to Edward W. Hartgenbush and Marvin Solland, Trustees for Decillion Associates, dated February 10, 1965 and recorded March 15, 1965 in Liber 2114 of Official Records, Page 19, Recorder's Serial No. J-34327, Sonoma County Records.

ALSO EXCEPTING that portion of Farms 234 and 232, as delineated upon "Plan of Subdivision of Santa Rosa Farms No. 3, recorded October 9, 1911 in Liber 26 of Maps, page 15, Sonoma County Records, particularly described as follows, to-wit:

BEGINNING at a point on the Westerly line of said Farm No. 234, distant thereon 303.00 feet Northerly from the Southwest corner of Farm 234; thence Southerly along said Westerly line 303.00 feet to said Southwest corner; thence Easterly along the Southerly line of said Farm 234, a distance of 650.76 feet to the Southerly corner common to said Farms 234 and 232; thence along the Southerly line of said Farm 232, North 89° 28' East, 9 feet; thence North 1° 31' West, 303.00 feet; thence Westerly in a direct line 659.76 feet, more or less, to said point of beginning.

A.P. No. 134-251-34

CUPP000031

# EXHIBIT "B"

## Cupp v. Smith

### 4:20-cv-03456PJH

RECORDING REQUESTED BY:

Ronald Cupp

WHEN RECORDED MAIL TO AND MAIL TAX
STATEMENTS TO:

Name: Ronald Cupp

Address: 150 Raley Town Center, Ste 2512

City: Rohnert Park

State, Zip: CA 94928

Above Space for Recorder's Use Only

# QUITCLAIM DEED

Title Order No._____ Escrow OR LOAN No._____ APN No. 134-251-063-000

THE UNDERSIGNED GRANTOR(s) DECLARE(s)

DOCUMENTARY TRANSFER TAX is $_____ CITY TAX $_____

☐ Computed on full value of property conveyed, or
☐ Computed on full value less value of liens or encumbrances remaining at time of sale.

☐ Unincorporated area   ☑ City of Santa Rosa _____, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Federal National Mortgage Association

Hereby remise, release and forever quitclaim to
Ronald Cupp

The following described real property in the County of _____, State of California
See Exhibit "A" attached hereto and made a part hereof

January 24, 2019
Date

Signature

Signature

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF ~~CALIFORNIA~~ Texas
County of Collin _____ } ss

On January 24, 2019 before me Derisa Hollins, Notary
Date                                    Name and Title of officer

personally appeared Trent Morrison _____ who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Derisa Hollins
notary signature

DERISA HOLLINS
Notary Public, State of Texas
My Commission Expires
April 05, 2019

QD (03/13/2015)   MAIL TAX STATEMENTS TO ADDRESS AS SHOWN ABOVE

All that certain real property situated in the County of Sonoma, State of California, described as follows:

FARMS 234, 235 and 236, as numbered and designated upon the Plan of Subdivision of Santa Rosa Farms No. 3, Sonoma County, California, recorded in the Office of the County Recorder of Sonoma County, California, on October 9, 1911 in Liber 26 of Maps, page 15.

ALSO, that part of Lot 232, described as commencing at the southwesterly corner of said Lot; thence North 1° 31' West, along the dividing line between Lots 232, 234 and 235, a distance of 677.87 feet to the southerly line of that certain tract under Agreement of Sale made by Harvey W. Burson and Bertha Lillian Bode, by Agreement dated August 30, 1934 and recorded in Liber 368 of Official Records, Page 265; thence along the Southerly line of said Bode, North 89° 28' East, 9 feet; thence South 1° 31' East, 677.98 feet to the Southerly line of Lot 232; thence along the Southerly line of said Lot South 89° 28' West, 9 feet to the point of commencement

EXCEPTING therefrom that portion contained in the Deed from Warren T. Pritchard and Dorothy L. Pritchard, his wife, to Peter A. Zarins, a married man and John T. Zarins, an unmarried man, dated February 1, 1965 and recorded February 24, 1965 in Liber 2109 of Official Records, page 923, Recorder's Serial No. J-31630, Sonoma County Records.

ALSO EXCEPTING therefrom that portion contained in the Deed from Warren T. Pritchard and Dorothy L. Pritchard, his wife, to Edward W. Hartgenbush and Marvin Solland, Trustees for Decillion Associates, dated February 10, 1965 and recorded March 15, 1965 in Liber 2114 of Official Records, Page 19, Recorder's Serial No. J-34327, Sonoma County Records.

ALSO EXCEPTING that portion of Farms 234 and 232, as delineated upon "Plan of Subdivision of Santa Rosa Farms No. 3, recorded October 9, 1911 in Liber 26 of Maps, page 15, Sonoma County Records, particularly described as follows, to-wit:

BEGINNING at a point on the Westerly line of said Farm No. 234, distant thereon 303.00 feet Northerly from the Southwest corner of Farm 234; thence Southerly along said Westerly line 303.00 feet to said Southwest corner; thence Easterly along the Southerly line of said Farm 234, a distance of 650.76 feet to the Southerly corner common to said Farms 234 and 232; thence along the Southerly line of said Farm 232, North 89° 28' East, 9 feet; thence North 1° 31' West, 303.00 feet; thence Westerly in a direct line 659.76 feet, more or less, to said point of beginning.

A.P. No. 134-251-34

Exhibit "A", page 1 of 1

CUPP000131

# EXHIBIT "C"

## Cupp v. Smith

### 4:20-cv-03456PJH

**\*\*electronically submitted
to the County of Sonoma for recording\*\***

# 2019013843

Official Records of Sonoma County
Deva Marie Proto
02/25/2019 10:49 AM
NEXTITLE - CALIFORNIA

DEED 2 Pgs

Fee: $27.00
County Tax: $338.25
City Tax:   $616.00



RECORDING REQUESTED BY
NexTitle, A Title and Escrow Co.

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:
Ronald Cupp
150 Raley Town Center Dr. Ste 2512
Rohnert Park, CA 94928

Order No.: NXCA-0309829
Escrow No.: NXCA-0309829

APN: 134-251-063-000

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## QUITCLAIM DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):     DOCUMENTARY TRANSFER TAX IS: $338.25 City $616.00

     _x_ Computed on full value of property conveyed, or
     ___ Computed on full value less value of liens or encumbrances
     remaining at time of sale.
     ___ Unincorporated area X City of Santa Rosa

For valuable consideration, receipt of which is hereby acknowledged,

Federal National Mortgage Association

hereby GRANT(S) to

Ronald Cupp, an unmarried man

the real property situated in the County of Sonoma, State of California, more particularly described as follows:

**For legal description of the real property herein, see Exhibit A attached hereto and made part hereof.**

Dated: _2-20-19_

Federal National Mortgage Association

By: _Trent Morrison_

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _TX_
COUNTY OF _Collin_ } SS.

On _2/20/19_ before me, _Christopher Lee Milligan_ Notary
Public, personally appeared _Trent Morrison_

who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature

CHRISTOPHER LEE MILLIGAN
Notary Public, State of Texas
Comm. Expires 08-06-2022
Notary ID 131671341

MAIL TAX STATEMENTS AS DIRECTED ABOVE

APN: 134-251-063-000

## Exhibit A

FARMS 234, 235 AND 236, AS NUMBERED AND DESIGNATED UPON THE PLAN OF SUBDIVISION OF SANTA ROSA FARMS NO. 3, SONOMA COUNTY, CALIFORNIA, RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SONOMA COUNTY, CALIFORNIA, ON OCTOBER 9, 1911 IN LIBER 26 OF MAPS, PAGE 15.

ALSO, THAT PART OF LOT 232, DESCRIBED AS COMMENCING AT THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH 1 DEGREE 31' WEST, ALONG THE DIVIDING TINE BETWEEN LOTS 232, 234 AND 235, A DISTANCE OF 677.87 FEET TO THE SOUTHERLY LINE OF THAT CERTAIN TRACT UNDER AGREEMENT OF SALE MADE BY HARVEY W. BURSON AND BERTHA LILLIAN BODE, BY AGREEMENT DATED AUGUST 30,1934 AND RECORDED IN LIBER 368 OF OFFICIAL RECORDS, PAGE 265; THENCE ALONG THE SOUTHERLY LINE OF SAID BODE, NORTH 89 DEGREES 28' EAST, 9 FEET; THENCE SOUTH 1 DEGREE 31' EAST, 677.98 FEET TO THE SOUTHERLY LINE OF LOT 232; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT SOUTH 89 DEGREES 28' WEST, 9 FEET TO THE POINT OF COMMENCEMENT.

EXCEPTING THEREFROM THAT PORTION CONTAINED IN THE DEED FROM WARREN T. PRITCHARD AND DOROTHY L. PRITCHARD, HIS WIFE, TO PETER A. ZARINS, A MARRIED MAN AND JOHN T. ZARINS, AN UNMARRIED MAN, DATED FEBRUARY 1,1965 AND RECORDED FEBRUARY 24,1965 IN LIBER 2109 OF OFFICIAL RECORDS, PAGE 923, RECORDER'S SERIAL NO. J-31630, SONOMA COUNTY RECORDS.

ALSO EXCEPTING THEREFROM THAT PORTION CONTAINED IN THE DEED FROM WARREN T. PRITCHARD AND DOROTHY L. PRITCHARD, HIS WIFE, TO EDWARD W. HARTGENBUSH AND MARVIN SOLLAND, TRUSTEES FOR DECILLION ASSOCIATES, DATED FEBRUARY 10, 1965 AND RECORDED MARCH 15, 1965 IN LIBER 2114 OF OFFICIAL RECORDS, PAGE 19, RECORDER'S SERIAL NO. J-34327, SONOMA COUNTY RECORDS.

ALSO EXCEPTING THAT PORTION OF FARMS 234 AND 232, AS DELINEATED UPON "PLAN OF SUBDIVISION OF SANTA ROSA FARMS NO. 3, RECORDED OCTOBER 9, 1911 IN LIBER 26 OF MAPS, PAGE 15, SONOMA COUNTY RECORDS, PARTICULARLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT A POINT ON THE WESTERLY POINT OF SAID FARM NO. 234, DISTANT THEREON 303.00 FEET NORTHERLY FROM THE SOUTHWEST CORNER OF FARM 234; THENCE SOUTHERLY ALONG SAID WESTERLY LINE 303.00 FEET TO SAID SOUTHWEST CORNER; THENCE EASTERLY ALONG THE SOUTH-SOUTHERLY COMER COMMON TO SAID FARMS 234 AND 232; THENCE ALONG THE SOUTHERLY
LINE OF SAID FARM 232, NORTH 89 DEGREES 28' EAST, 9 FEET; THENCE NORTH 1 DEGREE 31' WEST, 303.00 FEET; THENCE WESTERLY IN A DIRECT LINE 659.76 FEET MORE OR LESS, TO SAID POINT OF BEGINNING.

# EXHIBIT "D"

## Cupp v. Smith

### 4:20-cv-03456PJH



# EXHIBIT "E"

## Cupp v. Smith

### 4:20-cv-03456PJH



02/15/2019







# EXHIBIT "F"

## Cupp v. Smith

### 4:20-cv-03456PJH



# EXHIBIT "G"

## Cupp v. Smith

### 4:20-cv-03456PJH















# EXHIBIT "H"

## Cupp v. Smith

### 4:20-cv-03456PJH

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  --oOo--

4   RONALD CUPP,              )
                             )
5           Plaintiff,       )
                             )  Case No.
6   vs.                      )  4:20-cv-03456-PJH
                             )
7   ANDREW SMITH, Individually,     )
                             )
8           Defendant.       )
   _____  )
9

10

11

12

13                  --oOo--

14

15              DEPOSITION OF

16

17              ANDREW SMITH

18

19          Thursday, July 22, 2021

20

21

22

23          Job Number: 779925

24   Reported by:

25          HEATHER M. LOFHOLM, CSR #11570

ANDREW SMITH - 07/22/2021

1                          APPEARANCES

2

3    For the Plaintiff (In Propria Persona):

4         RONALD CUPP
          150 Raley Town Center, Suite 2512
5         Rohnert Park, California 94928
          (707)318-9929
6         ronc2009@gmail.com

7
     For the Defendant:
8
          COUNTY OF SONOMA
9         BY:  MICHAEL A. KING, ATTORNEY AT LAW
          575 Administration Drive
10        Santa Rosa, California 95403
          (707)565-2421
11        michael.king@sonoma-county.org

12

13

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

ANDREW SMITH - 07/22/2021

1           INDEX OF EXAMINATIONS

2                               Page

3   By Mr. Cupp                    4

4                   --oOo--

5           INDEX OF EXHIBITS

6   Deposition
    Exhibit Number      Description         Page
7

8   Exhibit 1        Notice of Deposition      4

9   Exhibit 2        Violation Complaint Form      4

10  Exhibit 3          Courtesy Notice        4

11  Exhibit 4        Color Copy of Photo Image      4

12  Exhibit 5        Color Copy of Photo Image      4

13  Exhibit 6        Color Copy of Photo Image      4

14  Exhibit 7        Color Copy of Photo Image      4

15  Exhibit 8        Color Copy of Photo Image      4

16  Exhibit 9        Color Copy of Photo Image      4

17  Exhibit 10        Color Copy of Photo Image      4

18  Exhibit 11        Color Copy of Photo Image      4

19  Exhibit 12        Notice & Order - Unlawful Use/      4
                     Zoning Violation
20
    Exhibit 13        Notice & Order - Construction      4
21                   Without Permit

22  Exhibit 14        Color Copy of Photo Image      4

23  Exhibit 15        Color Copy of Photo Image      4

24

25                   --oOo--

ANDREW SMITH - 07/22/2021

1      BE IT REMEMBERED that on Thursday, July 22, 2021, at

2   the hour of 9:53 a.m., of said day, at the offices of

3   Litigation Services, 3510 Unocal Place, Suite 115,

4   Santa Rosa, California, before me, HEATHER M. LOFHOLM, a

5   Certified Shorthand Reporter, personally appeared

6                    ANDREW SMITH,

7   called as a witness herein, having been first administered

8   an oath in accordance with CCP Section 2025, was examined

9   and testified as follows:

10         (Deposition Exhibit Numbers 1 through 15

11              were marked for identification.)

12                    EXAMINATION

13   BY MR. CUPP:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Mr. Smith, my name is Ron Cupp.  I'm not an

17   attorney.  I am pro se in this lawsuit.  Since I don't

18   have legal background I want to clarify that if you don't

19   understand my question ask me, and I'll repeat it or

20   clarify it for you.  If there's anything you're not sure

21   of, don't guess.  Just go ahead and tell me that you're

22   unsure, and we'll clarify the question.

23         I believe we've agreed to cut this short today

24   because you have a medical appointment this afternoon,

25   which is fine.  I believe I'm just going to do the basic

Page 16

1    Q.   -- somewhere around '92 to approximately --

2    A.   '94.

3    Q.   And '94 you were hired by the Sonoma County

4   Sheriff?

5    A.   Marin County Sheriff's Office as a communications

6   dispatcher.

7    Q.   Okay.  So that takes you to approximately what

8   year?

9    A.   So from August of '94 until August of 2000 I was

10   a dispatcher for the sheriff's office.

11    Q.   Marin County Sheriff's?

12    A.   Marin County Sheriff's Office.

13    Q.   Okay.  So 2000, your next employment?

14    A.   Marin County sheriff's deputy from August of 2000

15   until March of 2018 when I retired.

16    Q.   March of 2018?

17    A.   Yeah.

18    Q.   Hired by?

19    A.   I retired.

20    Q.   Oh, you retired as a police officer, a sheriff?

21    A.   Deputy sheriff, yeah.

22    Q.   Got it.  So you were actually in law enforcement

23   up until 2018?

24    A.   Uh-huh.

25    Q.   Okay.  What did you do after you retired?

ANDREW SMITH - 07/22/2021

Page 17

1      A.   I took a break of two months while I got my

2   daughter headed to college, applied for a myriad of

3   jobs -- I think there was like four or five.  I

4   interviewed for two, got this job, started July 31st of

5   2018 and have been employed here since then.

6      Q.   So "this job" would mean the County of Sonoma?

7      A.   Sonoma, Code Enforcement Inspector II.

8      Q.   Code Enforcement Inspector II is your actual

9   title?

10      A.   Yeah.

11      Q.   Okay.  And you've been in that same position ever

12   since?

13      A.   Yeah.

14      Q.   Okay.  So you haven't switched jobs or

15   departments within the County at all?

16      A.   Within Sonoma County?

17      Q.   Yes.

18      A.   No.

19      Q.   Okay.  And so you still are a code enforcement

20   inspector II?  Is that what the title is?

21      A.   Yes.

22      Q.   Okay.  When you were first hired by Sonoma County

23   in the permit resources department did they give you a

24   book, a training guide or anything that told you what to

25   do or ...

ANDREW SMITH - 07/22/2021

Page 18

1      A.   Training guide?  There was a list of things that

2   I was going to be instructed on and received that

3   instruction, so it wasn't a book on how to do it, no.

4      Q.   Okay.  So you received training?

5      A.   Yeah.

6      Q.   Who gave you the training?

7      A.   It was primarily from Senior Inspector Ryan

8   Pelleriti.

9      Q.   Okay.  Is it classroom type, or was it jump in

10   the car and "Let's do a drive-by" or, you know, a

11   ride-along or something like that?

12      A.   Both.

13      Q.   Okay.  Was there an actual manual or something

14   that he used in order to train you?

15      A.   I think your reference would be like -- when I

16   was a field training officer as a sheriff in the Marin

17   County Sheriff's Office we had -- every single law, case,

18   procedure, practice, everything got explained and signed

19   off.  I signed it.  They signed it.

20      Q.   That was in law enforcement?

21      A.   Law enforcement.

22      Q.   Okay.

23      A.   Here, no.

24      Q.   Okay.  So can you give me examples of what he

25   trained you on?

Page 19

1      A.   We went to -- how to find a house.  We did

2   research on property, case research for older cases and

3   what's behind -- what permits are behind it, when you have

4   a complaint how much research do you have to do based on

5   the complaint.  We did -- I did a lot of old cases, so

6   after I finished my initial training a lot of the stuff I

7   did was old cases, which was just stuff all over the

8   county, and it's kind of like, you know, jumping in and

9   start swimming.  "You'll figure out the strokes here in a

10   few minutes" kind of thing and the idea being that

11   (unintelligible) --

12                  (Reporter admonition.)

13            THE WITNESS:  The idea being you'll figure it out

14   in a minute.  "Here's the case.  Do your research.  Find

15   out where it is and what you need to do with it now," and

16   each one of those cases, as I worked them I would need a

17   little coaching along the way.  When I was finished with

18   the work if I didn't need any coaching up until the last

19   part I'd say, "Hey, this is what I found.  This is what I

20   did.  This is what I think.  This is what I wrote," and he

21   would review the case and add anything in, and so over

22   time each case needed less coaching, and I was learning

23   from each case that I would go through.

24   BY MR. CUPP:

25      Q.   Okay.  When you said "he would" --

ANDREW SMITH - 07/22/2021

Page 27

1  it changed hands and that owner cleaned the property and

2  there was nothing left, so not everything was an old

3  house.

4        Not everything was a house.  I had a motel that

5  had a septic issue.  We cleared that up, so it's not -- it

6  was old notice of violations.  It's a particular status in

7  our file system.  If you want clarity on that I'll give it

8  to you.  A case comes in.  It's received --

9      Q.  This is a new case?

10     A.  New case.  We go out.  In previous incarnations

11  of code enforcement they would send a courtesy letter,

12  issue you a notice of violation, again go issue you a

13  notice and order, and then continue on with the multiple

14  steps beyond that, but you see how it went, courtesy

15  letter, notice of violation.  We still don't have legal

16  standing to make anything happen until we give you the

17  notice and order.  Notice of violation is not required.

18  The courtesy letter is not required.

19        Tyra wanted to reduce the man hours for both the

20  clerical staff and the inspector staff by removing a step

21  that didn't need to be done anymore.  It wasn't required

22  when they started doing it.  It's just a waste of time.

23  We still occasionally do the courtesy letter, but most

24  often we go out and make contact with people.  If we can't

25  find them there and there's no way for us to determine

ANDREW SMITH - 07/22/2021

Page 28

1   that the violation exists, we can leave a courtesy door

2   hanger.  It's like a letter.  It says "Please give me a

3   call about this violation."  There's the business card you

4   can attach to it, but you take the staff time away from

5   the clerical staff of making them write a letter, and you

6   can also get through it -- so, you see, we're reducing

7   staff time down as much as we can so that we can reduce

8   our case load down.  More time in the fruit of where we

9   need to be, less time in the wasted time.

10      Q.   So is it the policy or procedure now that they

11   don't do the first two steps, which is the letter and -- I

12   forgot the second (unintelligible) --

13      A.   Notice of violation.

14               (Overlapping voices.

15               Reporter admonition.)

16   BY MR. CUPP:

17      Q.   I forgot what the second step was that they

18   reduced.  Now you go straight to a notice and order?

19      A.   That's correct.  The notice of violation has been

20   removed.

21      Q.   So courtesy notice.  Then a notice of violation

22   are gone, and then you do a notice and order is what you

23   actually send out?

24          MR. KING:  Mischaracterizing his testimony.  He

25   just answered that twice, but you can answer again.

ANDREW SMITH - 07/22/2021

Page 29

1        THE WITNESS:  Okay.  So for clarity, we still

2   have the option of a courtesy notice, courtesy letter if

3   it's appropriate.  The notice of violation no longer

4   exists in our practice and policy.  The notice and order

5   remains.  It's the first step where we have legal action

6   against the property owner for the particular violation

7   stated on the notice and order or orders.

8   BY MR. CUPP:

9        Q.   So what would be the legal status of that notice

10   and order?

11        A.   I'm not sure what you're asking.

12        Q.   You just mentioned that that's the first step

13   that you have legal authority for.

14        A.   Well, in a notice and order it orders you to do

15   something, which is to stop or correct within 30 days, and

16   failure to stop or correct within 30 days allows us to go

17   continue on in our enforcement, which is to add civil

18   penalties -- daily civil penalties and, of course, further

19   enforcement which -- up into recording a lien and going

20   further with county counsel taking action.

21        Q.   So you can actually file a lien on a property

22   without having a hearing?

23        MR. KING:  Okay.  So insofar as it calls for a

24   legal conclusion and a complex situation without --

25   incomplete hypothetical.

Page 36

1        MR. KING:  You can tell him that.

2        THE WITNESS:  She's the manager.  Manager,

3    supervisor, senior code enforcement inspector, code

4    enforcement inspector II, code enforcement inspector I.

5    BY MR. CUPP:

6      Q.   Thank you.  So if I got that right, Tyra is Mark

7    Franceschi's boss?

8      A.   Correct.

9      Q.   Okay.  Mark Franceschi is your boss?

10     A.   Correct.

11     Q.   And do you have anybody under you?

12     A.   No.

13     Q.   Okay.  So, obviously, if you've been in law

14   enforcement you have had training on how to obtain

15   warrants?

16     A.   Yes.

17     Q.   Can you explain what kind of warrants you've

18   taken out in the past.

19     A.   With the help of others, not on my own, three

20   search warrants for property and crimes against

21   property -- crimes and crimes against persons back -- the

22   time was back from 2000 to 2006.

23     Q.   So this is when you were in law enforcement?

24     A.   Yeah.

25     Q.   Okay.  As a code enforcement man have you taken

Page 37

1  out any warrants?

2    A.  Have I taken out any warrants?  No, I did not.

3  I've asked for them.

4    Q.  So you've applied for warrants?

5    A.  No.  I asked for them.  I asked my supervisor.

6  "We need to get an inspection warrant for this property

7  and this property, because that person said so," and he

8  agreed, and that's what we did.  That was last week, first

9  one.

10    Q.  Okay.  So last week is the first time you

11  obtained an inspection warrant?

12    A.  Participated in it.

13    Q.  Fine.  So you didn't write the warrant?

14    A.  No.  I did a lot of writing, but I did not write

15  the warrant.

16    Q.  You didn't write the affidavit of probable cause?

17    A.  No, sir.

18    Q.  Okay.  Who submitted it to the court?

19      MR. KING:  So are we talking about the one that

20  was last week?

21      MR. CUPP:  Yes.

22      MR. KING:  Okay.  It's not relevant.  Not

23  reasonably calculated to lead to the discovery of

24  admissible evidence.  Argumentative and harassment.

25      You can answer the question.

Page 40

1   dangerous, more "get to it as soon as you can."

2      Q.   So it's more dictated by safety --

3      A.   Fire life safety.

4      Q.   -- concerns?  Can you -- so now I'm going to talk

5   specifically about 4640 Arlington Avenue, which is my

6   property.

7      A.   Okay.

8      Q.   Okay.  Can you let me know when you first became

9   aware of my property.

10      A.   It was prior to February 15th, 2019.  I don't

11   recall the date that I was assigned that case.

12      Q.   Okay.  But my property is within your Sonoma

13   County area?  You're assigned to that area?

14      A.   I was assigned to that area, yes.  Correct.

15      Q.   Are you not assigned there anymore?

16      A.   No.

17      Q.   Okay.  Where are you assigned now?

18      A.   I have a larger area, Sonoma Valley.

19      Q.   Okay.  This is Exhibit Number 2.  Do you

20   recognize that document?

21      A.   Yes.

22      Q.   Is it done in the normal course of business?

23      A.   You mean is this a normal form we use?

24      Q.   Yes.

25      A.   Oh, yeah.  Yes.

Page 41

1    Q.   Did you prepare that form?

2    A.   No.  It was prepared by Jackie Crawford.

3    Q.   Okay.  Can you tell me what that form is.

4    A.   It's a violation complaint form with the name on

5    it.  It's the data that takes the complainant's

6    information that they've given to us and put in the manner

7    that essentially -- this is the data and the language that

8    we use for code enforcement.

9    Q.   Okay.  So after she does the initial input how

10   does it get to you?

11   A.   Let's see.  I'm trying to think if this was at

12   the time when it was by paper or by digital.  I don't

13   remember.  So I'll give you today.  You have a list that

14   you can access, and I access it all the time, and at the

15   top it shows stuff that's just been received, new case.

16       On that new case this document is attached as a

17   document, and I can read it, any other documents that may

18   have been submitted, a photograph or a letter or a phone

19   message, whatever, and that's how I can access it.  I

20   generally if there's any bit of notes on here will take

21   this out to the property with me just so I can look at it

22   just to be able to verify what the note says, but I don't

23   always.

24   Q.   So is the form continually filled out?

25   A.   No.  Today -- in today's world it's no longer

ANDREW SMITH - 07/22/2021

Page 42

1   touched.  Once it's been created it remains that way.

2      Q.   Okay.  So you received this complaint?

3      A.   Right.

4      Q.   And that gave you the focus of my property?

5      A.   Yes.

6      Q.   Did you go out to the property?

7      A.   I did.

8      Q.   Can you tell me when?

9      A.   The first time I went there was the first time

10   noted, which was February 15th.

11      Q.   I'm going to try and correct your memory.  I'm

12   going to give you Exhibit Number 3, which is another

13   document.  Do you recognize that document?

14      A.   Yeah.  It's a courtesy notice.

15      Q.   Okay.  Can you tell me the date on that document.

16      A.   January 29th.

17      Q.   Okay.  So you wrote that letter without going out

18   to the property?

19      A.   Yes -- no, no.  Wait.  No.  I did not write this

20   letter.  I requested this letter.  Staff created the

21   letter and used my signature or they asked me to sign it.

22   Usually they use my signature, and I'm going to tell you

23   that's not a wet signature.

24      Q.   Okay.  So you -- someone sent that letter out,

25   but it wasn't you?

Page 43

1    A.   At my request.

2    Q.   Right.  But what I'm trying to get at is you

3  didn't go out to the property?

4    A.   No.

5    Q.   So again, you were correct.  February 15th was

6  the first time you went out to my property.

7    A.   Correct.

8         MR. CUPP:  Okay.  Mr. King, can I give him

9  several photos to authenticate?

10         MR. KING:  Yes.

11         MR. CUPP:  Okay.  And that way we can just go

12  through the normal --

13         MR. KING:  Are they a group exhibit, or are they

14  individual?

15         MR. CUPP:  They're individual --

16         MR. KING:  Fine.

17         MR. CUPP:  -- but they were all taken

18  February 15th at the time -- this is what was submitted

19  through your production of documents to me.

20         MR. KING:  Yeah, I know.  I understand.  I just

21  wanted to know -- when you identify them, generally

22  speaking, Mr. Cupp, you tell him -- and I will just do

23  this for you, if I could -- "I'm going to show you what's

24  been marked as Exhibits 4 to 11."

25         MR. CUPP:  Okay.

Page 44

1        MR. KING:  The stamps are at the bottom so that

2   when we're looking at the one particular photograph you

3   can refer to that exhibit number at the bottom, and then

4   show him, Mr. Cupp, so he sees which one you're talking

5   about.  Okay?

6        THE WITNESS:  Okay.

7        MR. KING:  Does that help?

8     MR. CUPP:  Thank you.

9     MR. KING:  Yeah.

10       MR. CUPP:  I'm learning every day.

11        MR. KING:  I'm just trying to make sure we do

12   this process the right way.  And you can -- hand them to

13   him one at a time.  That's fine.

14   BY MR. CUPP:

15     Q.   I'm handing you Exhibits 4 through 11, which are

16   photographs, to see if you recognize them.

17     A.   So four through ten, I'm sure that I took them on

18   February 15th, 2019, but eleven, this particular view I

19   don't think I took on that date, and the date is covered

20   by this -- if it's actually there.

21     Q.   There is no date on that one.  That's why this

22   was included in what was produced --

23     A.   Okay.

24     Q.   -- through the production of documents, but

25   there's no date on there, so I was trying to find out.

Page 45

1        MR. KING:  Well, you know, I'm going to disagree

2   with your representation, Mr. Cupp.  There may not have

3   been any date on what you have produced to Mr. Smith

4   today, but all the documents -- the photographs which we

5   sent have date stamps.

6   BY MR. CUPP:

7     Q.   Can I see this?

8     A.   Yes.

9     Q.   So this has your Bates stamp that looks like it's

10  number 15 or 14 on the bottom.  It's so small, but it does

11  have the Bates stamp.

12     A.   So just so I focus on Exhibit 11, in the times

13  beyond February 15th -- and this is only so you can

14  understand why I'm saying that I don't think this was that

15  date -- I parked off and away from your property and

16  stayed on the right-of-way when I visited to take a

17  picture or drove by and took a picture.  I did not enter

18  onto any portion of the property whatsoever, and the

19  reason why I say that is that's the view that I would see

20  when I initially got out of my car.  I would take the

21  picture and then walk and look from the roadway and then

22  leave.

23     Q.   Okay.  Can I see that exhibit for a second.

24     A.   Sure.

25     Q.   Do you research or find out where the property

ANDREW SMITH - 07/22/2021

Page 46

1  lines are when you go out to a property?

2      A.   Not usually, no, not ...

3      Q.   So you don't know where the actual property lines

4  are on my property?

5      A.   Not on any property without a survey and the

6  markers.

7      Q.   Well, just generally -- in this case the asphalt

8  road stops, which is the end of the public county road.

9  Where the gravels starts shown in Exhibit 11 is all the

10  private driveway for three properties.

11        MR. KING:  Okay.  So I'm going to object as to

12  your characterization and the question as calls for

13  speculation and incomplete hypothetical.

14        You can answer.  Do you see what he's saying?

15        THE WITNESS:  What I see is -- when I look at

16  this picture I see this is all gravel roadway.  This

17  driveway right here is paved, and it goes into the

18  adjoining property, which is a commercial tree -- nursery,

19  and I don't know exactly what they do in there, but I

20  think they grow, sell, market trees in there.  That's my

21  guess from the sign out front, and then from the fence

22  line that is across the back of your property -- and

23  that's the way I'm going to describe it.  So it would be

24  southern edge of the property -- is like a five-foot-tall

25  or four-foot-tall see-through fence, and then along the

Page 47

1   western edge is the taller solid wood fence.

2        Now, I would tell you that your property line as

3   defined by a surveyor would be at one point, and then the

4   County would say that we have a right-of-way that goes to

5   this point, depending on your zoning, the width of the

6   road, and all that would vary, so where your property

7   ends, where the County stops having jurisdiction over the

8   right-of-way is all varied by the property and so on.

9   BY MR. CUPP:

10       Q.   Thank you for that clarification.  So you did

11   take the pictures that have a February 15th date stamp on

12   them?

13       A.   Yes.

14       Q.   Okay.  Did you put that date on there?

15       A.   Yes.

16       Q.   Was it taken with a camera or a cell phone?

17       A.   Neither.  IPad.

18       Q.   An iPad?  Okay.  Is that something that the

19   County gives you?

20       A.   They had issued me an iPad when I first started,

21   and I used that for the first two years, yes.

22       Q.   From July 2018 to '20 -- July of '20?

23       A.   I think it was right around -- COVID was in

24   March.  That's the shutdown, right?  So I got it right

25   before the shutdown.  Right around February '20 is when I

ANDREW SMITH - 07/22/2021

Page 48

1   got the new device that I use now.

2       Q.   Okay.  So you were using a company-supplied iPad

3   that you took with you, and that's what you took your

4   pictures with?

5       A.   Correct.

6       Q.   Okay.  Did you install the date on these

7   pictures?

8       A.   Yes, I did, using a program or app called

9   DateStamper.

10      Q.   Okay.

11      A.   DateStamper puts the date here on the front from

12  the -- I'm just learning this stuff recently.  I think the

13  word you might have used was "metadata."  The data that

14  comes on the camera that is in that -- I'm not a digital

15  world person, but if I was to take a group of five

16  pictures of the same property with five different dates

17  and I selected them all at the same time, it would give

18  the correct date that they were taken, so it doesn't give

19  today's date.  It gives the date that it was taken.  I

20  always do it on the date that I'm there so -- because I

21  didn't know this information until recently, that it's

22  metadata that tells it.  You can't mess with it.

23  DateStamper takes the date from -- the actual date and

24  puts it on there.

25      Q.   Thank you.  I learned something right now.  So

Page 52

1          MR. KING:  But you're -- you're using it and -- I

2   understand it and I think Mr. Smith has understood that

3   you're using that just to describe what the County's

4   system or practices are.  Okay?  So I just want to make

5   the record clear.

6          MR. CUPP:  I'm going to ask a quick question

7   before we take a break because you brought that up.

8      Q.   Do you work for County of Sonoma or Sonoma

9   County?

10     A.   Tomato, tomato.

11         MR. KING:  It calls for a legal conclusion, but

12  he works for the County of Sonoma.  I can answer it.

13  There is no such thing as "Sonoma County" in that respect.

14         MR. CUPP:  Okay.  I think it's time for a break.

15  Can 15 minutes be okay?

16         MR. KING:  Whatever you need, sir.

17         MR. CUPP:  Fifteen minutes are fine.  Let's come

18  back at 11:15.  Thank you.

19                (Recess was taken.)

20         MR. CUPP:  We're back on the record.

21     Q.   Mr. Smith, those photographs I'm handing you are

22  Exhibit 4 through --

23         MR. KING:  Is this the extra copy?

24         MR. CUPP:  Yes.

25         MR. KING:  Thank you.

Page 53

1  BY MR. CUPP:

2      Q.  -- eleven.  Would you look at Exhibit 4 and tell

3  me your recollection of that photograph.

4      A.  The photograph taken of -- at a broad angle of

5  the front view of 4640 Arlington.

6      Q.  And you took the picture?

7      A.  Yes.

8      Q.  Okay.  Can you look at Exhibit Number 5.

9      A.  Yes.

10     Q.  Can you explain that picture also.

11         MR. KING:  I'm just going to object as vague and

12  ambiguous as to the request, but go ahead and answer.  I

13  think you understand what he's asking.

14         THE WITNESS:  This picture is a picture of the

15  garage structure which is adjacent to the public roadway.

16  It also shows quite a bit more in this picture, including

17  stacks of lumber, fence missing on the right side or south

18  side.  It shows a digital TV receiver, commonly known as a

19  dish or satellite dish on the top of it, which indicates

20  oftentimes that that structure's being used for

21  habitation.

22         On the left side it shows that there's no gate.

23  You can see inside there more construction materials

24  inside that gate.  You can see on the southeast corner

25  that there's a door, like a residential-style door,

1   swinging door that goes into the garage structure.  You

2   can see that there's a window behind what looks like the

3   original gate that may, in fact, have not been a gate and

4   that I'm just not recalling whether that was a piece of

5   fence that was put there or if that was an original gate.

6          There's a post not connected to any fence which

7   appears to be part of what is going to be or is now,

8   apparently, the fence -- the taller fence that's new in

9   that area on the right side of it.  I also see by looking

10  at the ground that it was a wet day.

11     Q.  We don't have those anymore.

12     A.  I wish we did.

13     Q.  Is there anything further on that picture?

14     A.  Right outside that open door is a toolbox of some

15  sort, and I couldn't tell you what kind of toolbox it is.

16  I mean, I recognize it as a toolbox.  There's plenty more

17  in the picture that I could point out, but I don't know

18  that it's necessarily relevant at this point.

19     Q.  That's fine.  Thank you.  And where were you when

20  you took that picture?

21     A.  Holding the iPad out in the -- probably right at

22  the edge of the right-of-way, yeah.

23     Q.  At the gravel driveway or on the gravel?

24     A.  Yeah.

25     Q.  Okay.  Can you explain photograph number six.

Page 55

1        MR. KING:  Okay.  Same objections.

2        You can answer.

3        THE WITNESS:  So photograph number six is a photo

4   of construction materials, construction debris, lumber,

5   cabinets, the back side of the inner fence that goes to

6   the residence.  It's taken with a view from essentially

7   underneath the carport that's a standing carport, and it's

8   to the north of or on the left side of the garage.  It

9   shows the single-family dwelling or residence in the back

10   of the picture on the left side of it.

11   BY MR. CUPP:

12      Q.   Pretty good memory.  Where were you when you took

13   that picture?

14      A.   In the open area that's next to the carport.

15      Q.   You were inside the fence line?

16        MR. KING:  Assumes facts not in evidence.

17        You can answer.

18        THE WITNESS:  There was no gate, and there's a

19   fence that was built partially, and I walked into an

20   ungated open-to-everybody area, yes.

21   BY MR. CUPP:

22      Q.   So the gate was -- excuse me.  The existing fence

23   line was to your back?

24        MR. KING:  I'm going to object.

25   Mischaracterizing the evidence.  Assumes facts.

Page 56

1          You can answer.

2          THE WITNESS:  I'm going to -- this is a hard

3    question here, because what I recall and what I'm seeing

4    here is -- quite possibly could have been -- I wasn't over

5    the top of the fence.  I was either -- if there was a

6    fence that was behind my back I was inside of it, but I'm

7    not sure how much had been completed at that point.

8    Unfortunately, we don't have a view standing back looking

9    at all the fence and what had been completed and what was

10   still undone.  See?

11   BY MR. CUPP:

12       Q.   Thank you.  Photograph number seven, do you

13   recognize it?

14       A.   It's the same location at a different view which

15   shows more of the inner fence, more of the construction

16   debris and materials.  In the distance you can see the

17   reflection on the uncovered windows of the single-family

18   dwelling.

19       Q.   Anything further?

20       A.   I think what's not able to be seen here because

21   of the reflection on the windows is that there was -- my

22   effort was to take a picture of the fact that you could

23   see in the windows and there was obviously nobody living

24   there.  That was my effort.  Didn't work.  You see the

25   clouds in the windows.

ANDREW SMITH - 07/22/2021

Page 57

1     Q.   And where were you when you took that picture?

2     A.   Same location as the last one, pretty much

3   rotated my body.

4     Q.   Exhibit Number 8?

5     A.   That's a picture of the same pile, supply of

6   construction supplies, boxes of flooring that are either

7   empty or partially empty, looking back under the carport

8   toward the garage structure which you can see two windows,

9   one of them being a French door and one being just a

10   regular residential window not commonly found in garage

11   structures that are not inhabited, an indication that the

12   structure was being converted from one thing to another as

13   reported.

14     Q.   And can you try and clarify where you were

15   standing.

16     A.   I'm standing under the carport structure outside

17   of the inner fence in the open area where there is no gate

18   precluding people from going in.

19     Q.   So is it fair to say you were between the inner

20   fence and the outer fence?

21         MR. KING:  Assumes facts not in evidence.

22   Incomplete hypothetical.

23         You can answer.

24         THE WITNESS:  Again, I'm not recalling how

25   complete the fence was, but with this piece missing, yeah,

ANDREW SMITH - 07/22/2021

Page 58

1   I was inside what was being constructed as the outer

2   fence.

3   BY MR. CUPP:

4       Q.   Thank you.  Exhibit Number 9?

5       A.   It's the left-hand side of the garage structure

6   where I posted the notice and order on the wall.

7       Q.   And that would be the notice of abatement?

8       A.   No.

9       Q.   What is this notice?

10      A.   That's the notice and order for the construction

11   without permit.

12      Q.   Exhibit Number 10?

13      A.   That was a view from the doorway side door that I

14   had originally talked about where the toolbox was outside

15   of the garage, my view when I stood there and was talking

16   to the worker on the inside.

17      Q.   So that is the man door on the south --

18      A.   East.

19      Q.   -- east and you're taking the picture from inside

20   the doorway?

21      A.   No.

22      Q.   That's the door frame right there.

23      A.   So I'm not inside the doorway.  I'm outside the

24   door capturing the doorway looking in.

25      Q.   Well, I think it -- that's fine.  Strike that.

ANDREW SMITH - 07/22/2021

Page 60

1    out.

2        MR. KING:  Okay.  So I'm going to object.

3    Overbroad.  Calls for speculation as to what you're

4    asking.  Vague and ambiguous.

5        You can answer the question.

6        THE WITNESS:  At the point at which we determine

7    that a violation exists we have a variety of different

8    forms.  This is a form that are specific to the type of

9    violation -- storm water, septic, grading.  This

10   particular one was a notice and order for construction

11   without permit, this particular form you're showing me

12   here, Exhibit 13.

13   BY MR. CUPP:

14       Q.   So when I see, like, number one, there's a

15   "CWOP."  That stands for "construction without permit"?

16       A.   Correct.

17       Q.   Okay.

18       A.   And I put that "CWOP" there because I know that

19   my staffer when they enter it into our Accela system are

20   going to put that first, and that's going to stimulate

21   "Okay.  I know what this is about," not what the details

22   are.  Remodel vacant, SFD, single-family dwelling, and

23   barn, no permit.

24       Q.   How did you know it was -- any work going on in

25   the single-family dwelling?

ANDREW SMITH - 07/22/2021

Page 61

1      A.   From the report, from the construction materials

2   and debris and that the interior -- from those pictures

3   where I was standing I could see that it was a vacant

4   residence in what appears to be the type of condition that

5   would be being remodeled, no window coverings, no

6   furniture.

7      Q.   How about the barn?

8      A.   I did not go in the barn, and I did not venture

9   close to the barn.

10     Q.   Because that's, like, 50 yards away?

11     A.   Well, it was more visible through the fence line,

12   but the doors weren't open on it.  There's just materials

13   around the -- out front of it.

14     Q.   So you don't know if there was any remodeling

15   going on in the single-family dwelling?

16        MR. KING:  Objection.  He just stated that he

17   observed different things that led him to believe that, so

18   it's argumentative and mischaracterizing his testimony,

19   but you can answer.

20        THE WITNESS:  It was reasonable to believe based

21   on the evidence that I saw, the information that I had,

22   that there was remodeling going on.

23   BY MR. CUPP:

24     Q.   So you didn't walk over to the house?

25     A.   No.

ANDREW SMITH - 07/22/2021

Page 65

1       You can answer.

2           THE WITNESS:  When I went to the property that

3   was listed as owned by a financial institution I had no

4   clue that any one human being, yourself, opened the

5   property.  The information I had was that a financial

6   institution owned it and that it was vacant, owned by a

7   bank, vacant.  That's the information I had.

8   BY MR. CUPP:

9       Q.   Did you think differently when you saw

10   construction materials or a person working there?

11          MR. KING:  Okay.  So that's overbroad.  Vague and

12   ambiguous.

13          You can answer.

14          THE WITNESS:  The information I had was that it

15   was being worked on, so it wasn't a surprise to me to see

16   someone working there.  My -- this is a general

17   expectation.  When we approach a property and there's

18   somebody there oftentimes it's the owner or the owner's

19   charge, meaning an employee, a son, a relative, doing the

20   work, so when I saw that the door was open and there was a

21   car parked out front -- vehicle parked out front, to be

22   specific, I approached the door to make contact with the

23   owner.  If ownership had changed since I was able to get

24   the data I wanted to give them the information that I had,

25   which was who I was, why I was there and what I was there

ANDREW SMITH - 07/22/2021

1    to check out.

2    BY MR. CUPP:

3        Q.   Do you believe you were actually on the property

4    when you were talking to the gentleman you talked to?

5            MR. KING:  Okay.  So I'm going to object as

6    overbroad.  Vague and ambiguous.

7            You can answer the question.

8            THE WITNESS:  Yes.

9    BY MR. CUPP:

10       Q.   Have you had any constitutional training?

11           MR. KING:  That's overbroad.  Vague and

12   ambiguous.  Calls for speculation as to what you mean.

13           You can answer the question if you understand.

14           THE WITNESS:  Yes.

15   BY MR. CUPP:

16       Q.   Can you give me an example of some of your

17   constitutional trainings?

18       A.   What area?

19       Q.   Did you get it through the police academy?

20       A.   Yes.

21       Q.   Did you get any through any other source?

22       A.   Yes.

23       Q.   Did you take any of the classes as an additional

24   learning benefit to any of your employment?

25       A.   With the County of Sonoma or the County of Marin?

ANDREW SMITH - 07/22/2021

Page 67

1    Q.   Let's start with Marin.

2    A.   Yes.

3    Q.   So explain what kind of training you had.

4    A.   Well, we're required to complete and certify in a

5  variety of areas for that role, which is a peace officer

6  role, which is entirely different than the role I have

7  here, entirely different.  My ability to enter -- gain

8  entrance, remain on a property as a peace officer is very

9  different than being a code enforcement inspector.

10    Q.   How so?

11    A.   You have more liberties based on the information

12  available to you as a peace officer than you do as a code

13  enforcement inspector.  Essentially as a code enforcement

14  inspector you're constrained more.

15    Q.   So you have more liberties as a peace officer

16  going on someone's property?

17    A.   Based on the information you have.

18    Q.   Okay.  Do you have a general idea of how many

19  hours of training you had that had to do with

20  constitutional trainings?

21    MR. KING:  Okay.  So are you talking again just

22  about law enforcement?  Are you talking about with regards

23  to code enforcement?  Are you talking about combined?

24    MR. CUPP:  Combined.

25    MR. KING:  Okay.