ERIC G. YOUNG, ESQ. (SBN 190104)
**YOUNG LAW GROUP**
411 Russell Avenue, Second Floor
Santa Rosa, California 95403
Tel.:  707.527.3637
Fax:  707.520.7272
Email:  eyoung@younglawca.com

Attorneys for Plaintiff
RONALD CUPP

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

        Plaintiff,

        vs.

ANDREW SMITH; et al.,

        Defendants.

CASE NO. 4:20-cv-03456PJH

**DECLARATION OF ERIC G. YOUNG IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR PARTIAL SUMMARY JUDGMENT**

Date: February 3, 2022
Time: 1:30 p.m.
Dept.: Courtroom 3, 3rd Floor
Judge: Hon. Phyllis J. Hamilton

I, ERIC G. YOUNG, declare:

1. I am an attorney duly licensed and admitted to practice law before this Court. I am the attorney of record for the Plaintiff RONALD CUPP in this action. If called upon, I could and would competently testify to the matters stated herein from my own personal knowledge, except for those matters which are stated on information and belief. As to those matters, I believe them to be true.

2. On December 7, 2021, I took part 2 of the deposition of Defendant ANDREW SMITH ("Officer Smith"), which concluded on that date. Attached hereto as ***Exhibit "A,"***



and incorporated herein by this reference, is a true and correct copy of relevant excerpts from Officer Smith's December 7, 2021 deposition.

3. Attached hereto as ***Exhibit "B*,*"** and incorporated herein by this reference, is a true and correct copy of Defendant Andrew Smith's Responses to Request for Admissions, Set One.

4. I have submitted two declarations that were electronically signed using an online computer software program called DocuSign: Declaration of Plaintiff Ronald Cupp in Opposition to Defendant's Motion for Summary Judgment, or Partial Summary Judgment and Declaration of David Harris in Opposition to Defendant's Motion for Summary Judgment, or Partial Summary Judgment. I have proof in my file verifying the signatures of these individuals which was sent to me from DocuSign, which I can submit to the Court if necessary.

5. I have also submitted the Declaration of Randall Cupp in Opposition to Defendant's Motion for Summary Judgment. I have verified Mr. Randall Cupp's signature, and I am maintaining his original, wet signature in the file, which I can also submit to the Court if necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: December 31, 2021              */s/Eric G. Young, Esq.*
                                       ERIC G. YOUNG, ESQ., Declarant



# EXHIBIT "A"

## Cupp v. Smith

### 4:20-cv-03456PJH

# Deposition Transcript

Case Number: 4:20-CV-03456 PJH
Date: December 7, 2021

In the matter of:

# Cupp v Smith, et al.

## Andrew Smith – Vol. II



**CERTIFIED COPY**

Reported by:
Theresa H. Bayle
CSR 4825

Steno
Official Reporters

1100 Glendon Ave.
Suite 1850
Los Angeles, CA 90024
concierge@steno.com
(310) 573-8380

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

5  RONALD CUPP,

6              Plaintiff,

7  vs.                    No. 4:20-CV-03456 PJH

8  ANDREW SMITH, et al.,

9              Defendants.

10  _____

11

12

13              Deposition of

14              ANDREW SMITH

15                Volume II

16      Remote via Steno Connect, California

17            December 7, 2021

18

19

20

21

22

23  Reported by:  Theresa H. Bayle
                 CSR 4825

24

25  Job No. 207320



1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

5
RONALD CUPP,

6              Plaintiff,

7
vs.                        No. 4:20-CV-03456 PJH

8
ANDREW SMITH, et al.,

9              Defendants.

10  _____

11

12

13

14

15          Deposition of ANDREW SMITH, taken on behalf

16  of the plaintiff, Remote via Steno Connect,

17  beginning at 10:07 a.m. and ending at 2:10 p.m., on

18  December 17, 2021 before Theresa H. Bayle, Certified

19  Shorthand Reporter, CSR No. 4825.

20

21

22

23

24

25

1    APPEARANCES:

2

3    For Plaintiff Ronald Cupp:

4        YOUNG LAW GROUP
         BY: ERIC G. YOUNG
5        411 Russell Avenue, SEcond Floor
         Santa Rosa, CA 95403
6        707.527.3637
         eyoung@younglawca.com
7

8    For Defendant Andrew Smith:

9        COUNTY OF SONOMA
         BY: MICHAEL A. KING
10       575 Administration Drive, Room 105A
         Santa Rosa, CA 95403
11       Michael.king@sonoma-county.org

12

13   Also present:

14       Elektra Knight, Steno Tech Assistant
         Ronald Cupp
15

16

17

18

19

20

21

22

23

24

25

1    Q.  But I'm not asking you to tell me how many

2   hours classes were, or which specific instructor you

3   had for a class.  I'm just trying to get a general

4   sense of what your recollection is of what your

5   training was you had?

6    MR. KING:  So, that's been asked and answered.

7   It is cumulative.  You can answer again.

8    THE WITNESS:  So, we had self-defense, physical

9   agility, rifle -- I'm sorry, shotgun and pistol.  We

10   had evidence law, criminal law.  We had patrol

11   procedures.  We had a little bit on custody.  We

12   had -- I'm trying to think of how they labeled it.

13   They didn't -- it wasn't named like we commonly name

14   things today.

15        So, you -- we got evidence law.  Evidence

16   law would be the one that had the greatest amount

17   and that covered the most information.  I think the

18   key part of that is, we are not just talking about

19   the Evidence Code, but if you can't get somebody's

20   statement because it is unlawful to take the

21   statement, that's part of your evidence.  Does that

22   give you an idea?

23   BY MR. YOUNG:

24    Q.  Somewhat.

25    A.  I didn't have Constitutional Law.  Does

1    THE WITNESS:  No.

2  BY MR. YOUNG:

3    Q.  Okay.  So, once you became a law

4  enforcement officer, can you estimate for me how

5  much of your time was spent -- maybe we will take

6  this one at a time.  At the town of San Anselmo,

7  what were your job duties?

8    MR. KING:  Okay, that's been covered already.

9  The line of questions which you are talking about

10  now has been covered by Mr. Cupp, who actually

11  stated he did not need to ask any more questions.

12  So, I'm going to let him answer briefly as to each

13  of these jobs he had.  So, you can answer the

14  question as to San Anselmo.

15    THE WITNESS:  In San Anselmo, I worked patrol.

16  BY MR. YOUNG:

17    Q.  Okay.  Was that -- was that traffic patrol,

18  is that accurate?

19    A.  I did a lot of traffic, but my

20  responsibility was patrol.  In that department,

21  there was an additional person that was assigned

22  traffic on a motorcycle, but I was not that person.

23  However, when you are working night shift in that

24  area, traffic is a good focus because you are going

25  after DUIs.  When you are working the evening shift,

1    the traffic is so heavy, you have to be out in the

2    traffic to make sure there's not problems and take

3    enforcement action when needed.  But you are working

4    generalized patrol, and the safety and security of

5    the town is the primary goal.

6        Q.  Okay.  Let me see if I can maybe shortcut

7    this a little bit, and try to not ask you things

8    that maybe you were already asked.

9            My understanding from reading your prior

10   deposition testimony is that, at least some of the

11   jobs that you had, you were primarily working inside

12   the station as opposed to being like out on patrol.

13   Is that accurate?

14       MR. KING:  I'm going to object as overbroad,

15   vague and ambiguous, calls for speculation as to

16   what you understand, Mr. Young.  But you can answer

17   the question.

18       THE WITNESS:  That only occurred when I worked

19   for the Marin County Sheriff's Office.

20   BY MR. YOUNG:

21       Q.  When you were at the Marin County Sheriff's

22   Office, can you tell me -- strike that.

23           Did you, also, work patrol at the Marin

24   County Sheriff's Office?

25       A.  Yes, I did.

1  deposition.

2     MR. KING:  Mr. Young, you can do whatever you

3  want, but I'm going to make objections because they

4  are perfectly appropriate under the circumstances.

5  I'm letting him answer the questions.

6     MR. YOUNG:  I understand that, but you're also

7  making objection that lack merit, and you know

8  better than that.

9     MR. KING:  Mr. Young, I'm making objections

10  which are the same as you were making in the

11  prior -- a few days ago with Mr. Cupp's testimony.

12  This has been covered.  He has been asked these

13  questions.  He has given his responses.  Mr. Cupp

14  didn't need to know anymore.  It doesn't have

15  anything to do with the issues which are being

16  presented here, whether he was on patrol or in the

17  office as a dispatcher.  I'm letting him answer

18  those questions.

19     MR. YOUNG:  For the record, I never objected on

20  the grounds of harassment.

21     MR. KING:  That's true.  I'm going to make those

22  objections, though.

23     MR. YOUNG:  Okay.  All right.  You do that.

24  BY MR. YOUNG:

25     Q.  When you were working at the Marin County

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   Sheriff's Office, you were involved in training and

2   teaching other employees of the Marin County

3   Sheriff's Office; is that correct?

4        A.  Yes, sir.

5        MR. KING:  Same objection, you can answer.

6        THE WITNESS:  Yes, sir.

7   BY MR. YOUNG:

8        Q.  And who were your students when you were

9   teaching and training?

10       MR. KING:  Same objections.  You can answer.

11        THE WITNESS:  Much of my training was one-on-one

12   with deputies.  I was also a training dispatcher

13   when I worked in the Dispatch Unit.  I formed,

14   created, and instituted the Cadet Program, and all

15   the cadets were my students.  I taught classes to

16   other law enforcement officers related to our, at

17   the time, new computer system, which is long since

18   old, for the entire county.  So, every agency that

19   was using that computer system went through classes.

20   I taught leadership and report writing to a variety

21   of different classes.  I think that's most of it.

22   BY MR. YOUNG:

23       Q.  Okay.  When you say leadership, what does

24   that mean exactly?

25       MR. KING:  Same objections.  You can answer.

1      THE WITNESS:  The leadership of the Sheriff's

2    Office believed at the time that we were changing

3    the form and method that we were using, and we

4    needed to institute a new framework of thinking, and

5    in doing so, not talking about leadership wasn't

6    helping.  So, they were bringing everybody in to

7    talk about it.

8          What that means, let's define the words,

9    let's talk about what it is, let's talk about what

10   it isn't, let's talk about how it works, and what it

11   is when you are a leader in your role as a deputy

12   sheriff.  Since I was a deputy, that's what I did,

13   but then, there was so on and so on up the ladder.

14   I worked on the line staff area.

15   BY MR. YOUNG:

16     Q.  Okay.  Did any of your training or teaching

17   at the Marin County Sheriff's Office involve

18   training or teaching how to conduct searches of

19   private property?  And by property, I mean real

20   property, land.

21     A.  Nope.

22     Q.  Did any of your training or teaching at the

23   Marin County Sheriff's Office involve how to obtain

24   search warrants for private property?

25     MR. KING:  I'm going to object as compound and

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   calling for speculation.  The reason why I'm

2   Objecting as to compound, Mr. Young, I'm not sure if

3   you are talking about his training and teaching to

4   cadets or you are talking about what he learned.

5   That's what I'm trying to find out.

6   BY MR. YOUNG:

7      Q.  So, the question may be somewhat vague and

8   ambiguous for that reason.  So, what I'm talking

9   about is the training and teaching you provided to

10   other officers or deputy sheriffs at the Marin

11   County Sheriff's Office.

12      A.  So, the answer would be yes, I provided

13   that training, but that would be at the one-on-one

14   level as a field training officer.

15      Q.  And how long were you a field training

16   officer?

17      A.  Five and a half, six years, something like

18   that.

19      Q.  So, at what point in your career did you

20   learn about how to conduct searches of private

21   property?

22      MR. KING:  Objection, overbroad, calls for

23   speculation as to what you mean, but go ahead and

24   answer as best you can.

25      THE WITNESS:  I would to say it was in every

1   form of training that I got.  So, when I went to the

2   Police Academy, when I went through the field

3   training program at San Anselmo PD, when I went

4   through the field training program at Petaluma PD,

5   when I went through the field training program at

6   the Marin County Sheriff's Office, and any legal

7   updates I went to would have been training related

8   to the searching of somebody else's private

9   property.

10  BY MR. YOUNG:

11      Q.  So, I'm a little confused because I thought

12  you said earlier that when you were at the Academy,

13  there was no training on how to obtain search

14  warrants and conducting searches.

15      MR. KING:  Objection, argumentative, asked and

16  answered.  You can answer again.

17      THE WITNESS:  You said the searching of private

18  property.  You didn't say search warrants.  Now, if

19  you want to know specifically about search warrants,

20  which is different than searching of someone's

21  private property, then, we can talk about that.  I'd

22  be happy to talk about that.

23  BY MR. YOUNG:

24      Q.  Okay.  Let's talk about search warrants.

25  When did you first receive training on how to obtain

1   BY MR. YOUNG:

2       Q.  Why did you leave the town of San Anselmo's

3   employment?

4       MR. KING:  Okay, so that's not relevant.  You

5   can answer.

6       THE WITNESS:  I wanted to move to a bigger city,

7   more happening, more opportunities.

8   BY MR. YOUNG:

9       Q.  And that bigger city turned out to be

10  Petaluma; correct?

11      A.  That's correct.

12      Q.  So, based on your prior testimony, it looks

13  like you were at the City of Petaluma for about 15

14  months; is that accurate?

15      MR. KING:  I'm going to object as argumentative,

16  cumulative, asked and answered.  You can answer

17  again.

18      THE WITNESS:  I thought it was longer than that,

19  I thought it was 17 months, but you could be right

20  on the number.  That's correct, I was on probation

21  when I left there.

22  BY MR. YOUNG:

23      Q.  What does that mean, you were on probation

24  when you left there?

25      MR. KING:  So, not reasonably calculated to lead

1   to the discovery of admissible evidence.  You can

2   answer.

3       THE WITNESS:  When you are a new employee in

4   government, you have a probationary time period,

5   which is usually between 30 days and six months, but

6   in law enforcement they tend to be a year or longer

7   depending on the nature of the employment.  Petaluma

8   had an exceptionally long 18-month probationary

9   period for peace officers.

10  BY MR. YOUNG:

11       Q.  And what was your position at the City of

12  Petaluma?

13       MR. KING:  Same objections.  You can answer.

14       THE WITNESS:  I was a police officer.

15  BY MR. YOUNG:

16       Q.  And what were your job duties?

17       MR. KING:  Same objections.  You can answer.

18       THE WITNESS:  My job duties were patrol.

19  BY MR. YOUNG:

20       Q.  And in that capacity, were you involved in

21  either obtaining search warrants or conducting

22  searches of property?

23       MR. KING:  Same objections.  You can answer.

24       THE WITNESS:  I wasn't involved in it.  I did

25  work on a case that stimulated a search warrant, but

1  got hired there, to answer this specific question,

2  was maintenance.  I was doing maintenance on a large

3  apartment property in Santa Rosa as part of my

4  part-time gig, extra money.

5  BY MR. YOUNG:

6      Q.  Okay.  So, from the Employment Development

7  Department, that's when you went to the Marin County

8  Sheriff's Office in about 1994; correct?

9      A.  There was a lull in between.  Keep in mind

10  if you went back and looked at the employment and

11  unemployment numbers in those time periods when I

12  started there, unemployment was high.  And I was,

13  then, hired in a state job, white male, speaks only

14  English.  I was in the zero to 40 position, meaning

15  zero to 40 hours per week.  And as much as I got to

16  work many weeks at 40 hours, towards the end there,

17  not many weeks at all.

18        So, yes, I was still employed there when I

19  resigned there and took the job in the Sheriff's

20  Office, but I hadn't worked for them in probably

21  five or six months.

22      Q.  Okay.  Are you saying there was a five or

23  six month gap between you working for the EDD and

24  the Marin County Sheriff's Office, or just that you

25  weren't given any assignments by the EDD for five or

ANDREW SMITH Vol II                                                      JOB NO. 207320
DECEMBER 07, 2021

1   six months?

2       A.  That's correct, I had not been given any

3   assignments.  I had not been working in the office I

4   was hired out of in Petaluma most of the -- since

5   the beginning of '94.  I did work there some, but I

6   was assigned in San Rafael.  I did some work in

7   Santa Rosa.  I actually worked in Chico for a little

8   bit on a project.  So, whatever she could find for

9   me, my manager, whatever she could find for me, she

10  got me time.  She wanted to keep me employed.

11      Q.  Once you moved to the Marin County

12  Sheriff's Department, did you have a particular rank

13  when you worked there?

14      MR. KING:  I'm going to object as not relevant,

15  not reasonably calculated to lead to the discovery

16  of admissible evidence and the prior objections.

17  You can answer.

18      THE WITNESS:  My first role there was a

19  Communications Dispatcher 1.

20  BY MR. YOUNG:

21      Q.  If I understand your prior testimony, you

22  retired from law enforcement in about 2018.  Is that

23  right?

24      MR. KING:  Same objections.  You can answer.

25      THE WITNESS:  That's correct.

1   Young.

2        MR. YOUNG:  I wonder what the judge thinks about

3   it if you keep this up.

4        MR. KING:  Mr. Young, he's been allowed to

5   answer your questions, even though they've already

6   been covered.  They don't have anything to do with

7   this case.  But you can continue to ask questions

8   and I will continue to object.

9   BY MR. YOUNG:

10       Q.  My question was you understand that this

11   lawsuit, brought by Mr. Cupp against you, pertains

12   to an inspection that was done at a property located

13   at 4640 Arlington Avenue on February 15, 2019?

14       MR. KING:  He just answered that.  He answered

15   the question.  He answered the question on the

16   record.  You can answer it again.

17   BY MR. YOUNG:

18       Q.  Answer it again.

19       MR. KING:  Well, no, he doesn't have to answer

20   it again, but I'm going to let him answer it again.

21       MR. YOUNG:  You know what, I'm about to suspend

22   this deposition, sir.

23       MR. KING:  You can do whatever you want.

24       MR. YOUNG:  I'm going to go to the judge.

25       MR. KING:  Go ahead, Mr. Young.  I am letting

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   him answer all of your questions.

2       MR. YOUNG:  You are absolutely creating nothing

3   but chaos in this deposition and you are going to

4   cause it to run longer than it should.

5       MR. KING:  Mr. Young, you can ask the questions.

6   If you ask him the same question you just asked and

7   he answered it, I'm going to object.  So, go ahead

8   and answer, Mr. Smith, again.

9   BY MR. YOUNG:

10      Q.  Go ahead.

11      A.  I understand, yes.

12      Q.  Okay.  Did you conduct that inspection of

13  the Arlington Avenue property on February 15, 2019

14  in your official capacity as an Code Enforcement

15  Officer with the County of Sonoma?

16      MR. KING:  See, all this line of questioning

17  has already been asked.

18      MR. YOUNG:  You are hijacking this deposition,

19  you are absolutely hijacking this deposition.  That

20  question was not asked before.  No questions were

21  asked about whether he was acting in his official

22  capacity.  So, your objections are without merit.

23  You are trying to hijack this deposition and it is

24  not going to work.

25      MR. KING:  Mr. Young, your objections to my

 1   questions at Mr. Cupp's deposition were based upon

 2   the same --

 3       MR. YOUNG:  This is not the same.

 4       MR. KING:  Are you done?

 5       MR. YOUNG:  It is not a tit-for-tat.

 6       MR. KING:  Mr. Young, of course, if you set the

 7   ground rules for the depositions, which you did,

 8   then, I get to use your ground rules, which are to

 9   object when appropriate.  If you ask the same

10   questions or the same line of questions which you

11   already talked about, then, I'm going to object.

12   I'm going to let him answer the question.  So, just

13   ask the question.

14       MR. KING:  I didn't set any ground rules at Mr.

15   Cupp's deposition.

16       MR. KING:  Of course you did.

17       MR. YOUNG:  No, I did not.  I really -- I'm

18   getting tired of you trying to put words in my

19   mouth.  You do this all the time and it is

20   inappropriate.  It is hijacking this deposition and

21   you need to stop it.

22       MR. KING:  I'm not going to stop making

23   objections.

24       MR. YOUNG:  You can make your objections, but

25   you are making objections that have no merit because

1   that question was not asked at the prior sitting of

2   your client's deposition.

3       MR. KING:  So, he can answer the question which

4   was just asked.

5       MR. YOUNG:  Madam Court Reporter, please read

6   back the question.

7       THE REPORTER:  "Q  Okay.  Did you conduct that

8           inspection of the Arlington Avenue

9           property on February 15, 2019 in your

10          official capacity as an Code

11          Enforcement Officer with the County of

12          Sonoma?"

13      THE WITNESS:  So, in response to that question,

14   everything is correct.  It would be yes, but I am a

15   Code Enforcement Inspector, just the term, just to

16   be correct.

17   BY MR. YOUNG:

18      Q.  Thank you.  As I understand it, you became

19   an employee of the County of Sonoma on July 31st,

20   2018; correct?

21      MR. KING:  Same objections.  You can answer.

22      THE WITNESS:  Yes, sir.

23   BY MR. YOUNG:

24      Q.  Okay.  So, when you conducted the

25   inspection on February 15th of 2019, you had been

1   employed by the County of Sonoma for about six and a

2   half months; is that accurate?

3       A.  Yes.

4       Q.  When you conducted the inspection of the

5   Arlington Avenue property on February 15, 2019, you

6   had never personally obtained an inspection warrant;

7   is that right?

8       MR. KING:  That has been asked and answered

9   already at the prior deposition.  You can answer

10  again.

11      THE WITNESS:  That's correct.

12  BY MR. YOUNG:

13      Q.  When you were hired by the County of

14  Sonoma, was there, to the best of your knowledge,

15  was there a job description for your position?

16      A.  Yes, there was.

17      Q.  And do you recall anything from that job

18  description, what it said?

19      A.  I'm going to have to guess.  No, I don't.

20      Q.  Okay.  I don't want you to guess.

21      A.  No, I don't recall.

22      Q.  We have been going for just a little bit

23  less than an hour.  So, I suggest that we take about

24  a five- to ten-minute break, if that's all right

25  with you.

1    A.  Yes, please.

2    MR. KING:  Mr. Young, I'm happy to take breaks

3  every hour or so.  You want to take a ten-minute

4  break at this time or do you want to take it

5  shorter?

6        Mr. Smith, would like to take a ten-minute

7  break, is that all right?

8    MR. YOUNG:  That's what I said.

9    MR. KING:  You said five to ten.  Ten after

10  11:00, is that when we would start again?

11    MR. YOUNG:  That's fine.

12    MR. KING:  Thank you.

13    THE REPORTER:  We are off the record at 10:59.

14        (Recess taken.)

15    THE REPORTER:  We are back on the record at

16  11:10.

17  BY MR. YOUNG:

18    Q.  Mr. Smith, we took a short break.  So, at

19  this point I'll ask you, is there any of your prior

20  testimony that you wish to amend or add to at this

21  point?

22    A.  No, sir.

23    Q.  So, I want to read a portion of your

24  testimony from the prior sitting of your deposition,

25  the questions you were asked when you were --

1      MR. KING:  Could you give me the page, sir?

2      MR. YOUNG:  Yes.  Page 17 starting at Line 22.

3   BY MR. YOUNG:

4      Q.  The question is:

5           "When you were first hired by

6           Sonoma County in the Permit Resources

7           Department, did they give you a book, a

8           training guide, or anything that told

9           you what to do?"

10          And your answer was:  "Training guide?

11          There was a list of things that I was

12          going to be instructed on and received

13          that instruction.  So, it wasn't a book

14          on how to do it, no."

15          Is that -- do you recall that testimony?

16      A.  Yes, sir.

17      Q.  So, I want to ask you some questions about

18   the list that you're referring to there.  Was the

19   list something in writing or was it something that

20   was conveyed to you verbally?

21      A.  It was a list in writing.

22      Q.  And who gave you that written list?

23      A.  Senior Code Enforcement Inspector Ryan

24   Pelleriti.

25      Q.  And what instructions to the best of your

1   recollection were on that written list?

2       A.  Sorry, I can't recall it for you.

3       Q.  Do you know if that list still exists?

4       A.  Yeah, I think it does.  I haven't seen it

5   in awhile.

6       Q.  Do you recall if there was any instruction

7   on the list about when to obtain an inspection

8   warrant?

9       A.  Yes, I do recall.

10      Q.  And what do you recall about that?

11      A.  There was nothing on it.

12      Q.  Was there any instruction on the written

13  list that discussed when you could search private

14  property without a warrant, an inspection warrant?

15      A.  I don't recall if that was on there.

16      Q.  So, you don't recall one way or the other?

17      A.  No, sir.

18      Q.  Okay.  And would you characterize your --

19  well, let me strike that.

20          To the best of your recollection did you

21  receive training on all of the areas that were

22  listed on the written list of instructions?

23      A.  It took a little while, but most of them

24  immediately, and some of them maybe up to six months

25  later.

ANDREW SMITH Vol II                                      JOB NO. 207320
DECEMBER 07, 2021

1      Q.  Do you recall which ones you were

2   instructed on immediately?

3      A.  No, I do not.

4      Q.  And do you recall the ones that you were

5   instructed on later, six months later?

6      A.  No, I do not.

7      Q.  Did you consider the instruction that you

8   received pursuant to that list, was that your

9   initial training at the County of Sonoma?

10      MR. KING:  Okay, so, I'm going to object.  It

11   calls for speculation, overbroad, vague and

12   ambiguous.  You can answer.

13      THE WITNESS:  It was part of the training that I

14   received.

15   BY MR. YOUNG:

16      Q.  Okay.  So, what I'm trying to ask you

17   though, is if you considered the instruction you

18   received pursuant to that list to be your initial

19   training?

20      MR. KING:  So, I am going to object.  It is

21   already asked and answered, and the same objections

22   as previously raised.  You can answer again.

23      THE WITNESS:  It is hard to answer the question.

24   It was the initial training that I got.  That's not

25   what I received the first day.  However, my

1  training, which I perceived to be most of the first

2  six months, most intensive in the first three

3  months, went on and on as projects came up.  As

4  different difficulties came up, I learned new things

5  day in and day out.

6  BY MR. YOUNG:

7     Q.  When you started your employment with the

8  County of Sonoma, were you out in the field making

9  contacts with homeowners?

10     MR. KING:  Okay.  So, I'm going to object as

11  already asked and answered.  This line of questions

12  has been covered already.  You can answer.

13     THE WITNESS:  I worked side-by-side with a

14  trainer, Ryan Pelleriti, for the first three to four

15  weeks I believe it was.  And then, the same type of

16  activity in the field with other more experienced

17  inspectors.

18  BY MR. YOUNG:

19     Q.  Okay.  So, let me possibly rephrase that,

20  that question.  What I'm interested to know is when

21  you first started with the County of Sonoma were you

22  out in the field on your own, making contacts with

23  homeowners?

24     MR. KING:  Same objections.  You can answer

25  again.

1       THE WITNESS:  When I first started, no.  As time

2    went on, yes.

3    BY MR. YOUNG:

4       Q.  When you first started with the County of

5    Sonoma, were you inspecting properties on your own?

6       MR. KING:  Same objections.  You can answer.

7       THE WITNESS:  Same answer.  In the beginning,

8    no.  As time went on, yes.

9    BY MR. YOUNG:

10       Q.  So, how long after you started with the

11    County of Sonoma did you start making contacts on

12    your own with property owners?

13       MR. KING:  Same objections.  You can answer.

14       THE WITNESS:  I couldn't tell you the date.

15    BY MR. YOUNG:

16       Q.  Well, can you give me an estimate?

17       A.  I think you have to look at it this way:  I

18    have been doing it forever, meaning making contacts

19    with people and talking to them.  I have built

20    rapport with people for years and years as a deputy

21    sheriff and investigator.  I have no problem talking

22    with people under stressful circumstances.

23       So, it didn't take long for them to say:

24    "You know what you're doing.  If you have a

25    question, give us a call.  Here is the framework of

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   what you are supposed to do.  Here's what you are

2   doing.  I don't need to hold your hand any longer."

3        And I think that was right about the third

4   month when -- I'm not saying the leash was

5   unleashed, but it was looser and looser as the days

6   went on.  After six weeks, you know, there was a

7   couple of things that I did on my own, and more at

8   eight weeks.  And by 12 weeks I was pretty much

9   running my own case load, as long as they were

10  checking my cases, and looking over what I did, and

11  where I went, and answering any questions that I

12  had.

13      Q.  And would that answer be the same if I

14  asked you how long after you started with the County

15  of Sonoma did you start inspecting properties on

16  your own?

17      MR. KING:  Same objections.  You can answer.

18      THE WITNESS:  Exactly the same.

19  BY MR. YOUNG:

20      Q.  Okay.  So, about 12 weeks in, you're

21  running your own cases; is that accurate?

22      A.  I don't have someone with me in the car,

23  that's accurate, yeah.

24      Q.  I'm sorry.  Could you say that again,

25  please.

1      A.  There's no one with me in the car.  I'm out

2   alone, but it doesn't mean they don't know what I'm

3   doing, or where I'm at, and why I'm doing it, and

4   they are not reviewing it.  All of it is being

5   reviewed.

6      Q.  No, I understand that.  I'm trying to get

7   at sort of what time period it was when you started

8   going out in the field on your own.

9      A.  Okay.

10      THE REPORTER:  Can you spell Ryan's last name

11   for me.

12      THE WITNESS:  Hum, give me a minute.

13      MR. KING:  I can.  P-e-l-l-e-r-i-t-i.  I'm

14   sorry -- yeah, P-e-l-l-e-r-i-t-i.

15   BY MR. YOUNG:

16      Q.  So, if I understand what you were saying

17   just a minute ago, based on your prior work

18   experience in law enforcement, when you went to the

19   County of Sonoma, there was some aspects of the job

20   that you really didn't need a lot of training on; is

21   that accurate?

22      MR. KING:  I'm going to object.  It calls for

23   speculation as to what your understanding is.  You

24   can answer the question.

25      THE WITNESS:  Yeah, it's correct.  I have a lot

1   of training and skills in documentation.  I have a

2   lot of training and skills in investigation, and in

3   talking to people, so building rapport, asking

4   questions, all of that, and conveying the

5   information that they need to know, because a lot of

6   what we do is both finding out and giving

7   information.

8   BY MR. YOUNG:

9       Q.  So, were there aspects of your job with the

10  County of Sonoma that you did need training on?

11       A.  Well, there was plenty.

12       Q.  So, what did you need training on?

13       MR. KING:  So, I'm going to object just

14  generally.  The line of questioning has been asked

15  and answered.  The same objections you raised at Mr.

16  Cupp's deposition.  You can answer the question.

17       THE WITNESS:  I think if you were to go back to

18  something you referenced earlier, which was the job

19  description, I think in everything that's described

20  in that job description, I need a little bit, if not

21  a lot of training in it.  Some was correlated to

22  what I did before, but a great deal of it wasn't.

23            I have experience in doing some building,

24  but I'm not a tradesmen.  I have experience in some

25  Code Enforcement stuff from when I was with Marin,

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1  because of what I did for their unit down there, but

2  I wasn't a code enforcement inspector there.

3          So, I have these connections that helped

4  build bridges that made the information easier to

5  understand and be able to assimilate quicker, but a

6  lot of it I had to learn.

7  BY MR. YOUNG:

8      Q.  And some of the training that you received

9  at the County of Sonoma was on-the-job and some was

10  classroom training.  Is that accurate?

11      A.  That's correct.

12      Q.  So, what did the classroom training consist

13  of?

14      MR. KING:  Same objections.  You can answer.

15      THE WITNESS:  Well, we had a couple of days of

16  classroom training one-on-one with Ryan where he was

17  drawing on the board and giving us flow charts, and

18  how things went, going from Point A to Point B, from

19  the complaint to the final action when the County

20  Counsel takes over a case because we don't get it

21  done any faster.

22          So, that was process, understanding

23  process, understanding our point of view at each

24  stage, what it actually looks like at each stage.

25  So, that was done one-on-one in the classroom.

1          But then, we went -- they provided training

2    to us -- the State of California has now recognized

3    an organization called CACEO, which is California

4    Code Enforcement Officer Association, and they are

5    the, for lack of a better correlation, POST --

6    right, you remember Police Officer Standards and

7    Training, right?  You remember that?  They are the

8    same thing with Code Enforcement Inspector Officers

9    in California.  They create the training, program

10   and standards for people in my role or similar to my

11   role.

12   BY MR. YOUNG:

13       Q.  Was that organization in existence, if you

14   know, when you first hired at the County of Sonoma

15   or is that something that came later?

16       A.  No, it was.  It was in existence.

17       Q.  Okay.  So, did any of your classroom

18   training consist of classes that that organization

19   put on?

20       A.  Three solid weeks, 40 hours each.

21       Q.  And when did you can take those classes?

22       A.  My first class was in late August.  Second

23   class was in December of '18.  And then, due to

24   circumstances that prevented it coming any quicker,

25   I just went through it, I believe, it was July for

1    Q.  Before you answer, what was your geographic

2  area in February of 2019.

3    MR. KING:  So, that's been asked and answered,

4  and covered already in the prior deposition.  You

5  can answer again.

6    MR. YOUNG:  For the record, it was not.  Go

7  ahead.

8    MR. KING:  Yes, it was, but you can answer

9  again.

10    THE WITNESS:  So, I think it was a little bit

11  after that time when I took on the Sonoma or the

12  Santa Rosa plain.  That's my description.  That's

13  not a label we call it.  The area is called the

14  Bellevue area, just a little part on the map.

15        But I was handling cases that they wanted

16  me to handle in that area prior to that because the

17  person that had it was too busy.  So, I don't

18  remember if it was right before this date or right

19  after, but I had no assigned area because I was

20  working on historical cases, and I was working on --

21  I do all vacation rentals, so, the whole county.

22  And I was taking on cases that they were assigning

23  to me that were either sticky or difficult, or the

24  guy that was working that area didn't have time for

25  it and that kind of thing.

ANDREW SMITH Vol II
DECEMBER 07, 2021                                                JOB NO. 207320

1            So, I think that's what happened in this

2   case, because the inspector may have been on

3   vacation, because there were two cases on that

4   street, one right across the street from each other

5   that I was assigned at the same time.

6   BY MR. YOUNG:

7       Q.  Okay.  And when you say that area in your

8   last answer, you're referring to the area around

9   4640 Arlington Avenue?

10          A.  Well, that area that 4640 Arlington Avenue

11  is inside of.  That's the Bellevue area.

12          Q.  Sure.  Is there a name given to that

13  geographic area by your department?

14          A.  Bellevue.

15          Q.  Bellevue, okay, thank you.

16          So, I want to read from your prior

17  deposition testimony at Page 27, Lines 10 to 15.

18  You are, I believe, testifying about -- you are

19  starting to testify about the processes in your

20  department for when a new case comes in.

21          A.  Uh-huh.

22          Q.  And you say:

23              "New case, we go out.  In previous

24              incarnations of Code Enforcement, they

25              would send a courtesy letter, issue you

1          a Notice of Violation.  Again, they

2              will issue you a Notice and Order, and

3              then, continue on with multiple steps

4              beyond that."

5        Do you recall that testimony?

6        MR. KING:  Well, that's not to 16.  That was to

7    14, but that's okay.

8        THE WITNESS:  Yes, I recall that.

9    BY MR. YOUNG:

10        Q.  Okay.  And is the courtesy letter the same

11    thing as a Notice of Violation or are those two

12    completely separate documents?

13        A.  They are completely separate documents.

14        Q.  And the courtesy letter that you're talking

15    about, was that a form letter to the best of your

16    knowledge?

17        A.  Yes.

18        Q.  In general terms, do you know what the

19    courtesy letter said?

20        A.  I have read a few of them.  "There's a

21    violation on your property."  To the property owner

22    that we have listed in the system that we have from

23    the Tax Office, and then, it says what the specific

24    property is, including the APN, and it has a

25    description of the violation, which could be a

1   variety of different things on there, that would

2   mean the same thing, because it could have been

3   taken from a description from the reporting party,

4   or maybe that didn't make sense, and words got

5   changed.

6          So, it could say -- here's an example

7   "CWOP - remodel structure."  And that could be as

8   little as is put there, and that's defining of what

9   could be on a letter.  And then, there will be a

10  description of what you need to do next.  Most of

11  that is get in touch with the inspector, here's his

12  phone number, here's his email.  That kind of thing.

13      Q.  Okay.  And the Notice of Violation, is that

14  a form?

15      A.  I have not used the Notice of Violation, so

16  I'm not going to testify to that.  I'm sorry.  I

17  know what it's legal standing is and I can give you

18  that, but I'm not going to be able to testify what

19  it says.

20      Q.  What do you mean what the legal standing

21  is, tell me about that.

22      A.  It is about as valuable as a courtesy

23  letter.

24      Q.  From your testimony, I take it, that you

25  consider it to have not much value?

1      MR. KING:  I'm going to object.  It is

2   mischaracterizing what the witness says,

3   argumentative.  You can answer.

4      THE WITNESS:  Well, legally, we can't do

5   anything if they have been given a Notice of

6   Violation.  So, if we can't do anything, even though

7   the words may be more harsh and direct in that, it

8   still requires a Notice and Order for us to take any

9   further action.

10          So, in our process, we remove that as part

11   of our normal practice.  Because it is not required

12   by law unless, it is your normal practice.  Since

13   they removed it as a normal practice, we don't use

14   it.

15  BY MR. YOUNG:

16      Q.  So, reading from your prior testimony at

17   Page 28, Lines 6 through 9, you are talking about

18   that process that you were just referring to, I

19   believe.  And you say:

20          "So, you see, we are reducing staff

21          time down as much as we can, so that we

22          can reduce our pace slow-down.  More

23          time in the fruit of where we need to

24          be.  Less time in the waste of time."

25      Do you recall that testimony?

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  I don't recall it, but it sounds about

2   right.

3      Q.  Okay.  What did you mean when you said the

4   fruit of where we need to be?

5      MR. KING:  I'm going to object.  This has been

6   covered already.  It has been asked and answered.

7   It is cumulative.  The whole area that you are

8   asking about has been covered already.  You can

9   answer.

10      MR. YOUNG:  I'm just trying to expand on the

11   testimony.

12      MR. KING:  I understand that and I'm letting him

13   answer, but this was covered at length.  Go ahead

14   and answer.

15      THE WITNESS:  If a Notice of Violation doesn't

16   get us anywhere legally, it is a wasted step.  It

17   provides no fruit.  It is like a farmer that has ten

18   trees and only one of them has apples on it.  Why is

19   he watering all ten?  You want the fruit.

20      That section -- when I came in, that had

21   been the mantra of the current management team, that

22   we are going to remove the excess, that we are going

23   to get rid of old cases by re-visiting them and

24   following up on them, and we are going to stop

25   unneeded steps as much as possible and only use

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   those steps where they are a valuable tool.

2          I'll give you an example, a courtesy

3   letter, we generally just go to the scene and say,

4   "hey, this is who I am, this is what I'm here for."

5   If I can't get someone to talk to, and I can't get

6   on the property, because it is fenced off, and you

7   know, for whatever reason, I leave a note, or I send

8   a courtesy letter, trying to get their attention so

9   I can talk to them on the phone, follow-up on a

10   complaint that we received.

11          So, we are working towards less work on the

12   clerical staff, less work on our part, to remove

13   steps that don't need to be there and only work on

14   the steps that need to be there.

15   BY MR. YOUNG:

16      Q.  So, just focusing on the steps that need to

17   be there, that's the fruit you are talking about?

18      A.  Yeah, it is the useful steps.

19      Q.  So, is the goal of your department to get a

20   Code Enforcement Inspector out to inspect the

21   property as quickly as possible?

22      MR. KING:  I'm going to object as overbroad,

23   vague, ambiguous, calls for speculation as to what

24   you mean, and overbroad as to time.  You can answer.

25   BY MR. YOUNG:

1      Q.  Let me, before you answer, at the time of

2   the inspection of February 15th, 2019, was that the

3   goal?

4      MR. KING:  Same objections.  You can answer.

5      THE WITNESS:  So, just to go back to that, if

6   you look, there was a courtesy letter sent in that

7   particular circumstance because we were still using

8   those more frequently than we are now.

9   BY MR. YOUNG:

10      Q.  I'm sorry to cut you off, because that's

11   not my question.

12      A.  I know that's not your question, but I'm

13   trying to answer.

14      Q.  Go ahead.

15      A.  So, at that time, once I was at that point,

16   which was to I need to get out there and see if I

17   can make contact, because no one responded to the

18   letter, then, I went out there and made contact, or

19   attempted to make contact, sorry.

20      Q.  So, Madam Court Reporter, can you read back

21   my last question.

22      THE REPORTER:  "Q  So, is the goal of your

23          department to get a Code Enforcement

24          Inspector out to inspect the property

25          as quickly as possible?  And let me,

ANDREW SMITH Vol II                                          JOB NO. 207320
DECEMBER 07, 2021

1              before you answer, at the time of the

2              inspection of February 15th, 2019, was

3              that the goal?"

4        MR. KING:  Okay, you've answered the question.

5        MR. YOUNG:  For the record, I don't believe he

6   has.

7        MR. KING:  So, you want him to answer it again?

8        MR. YOUNG:  I want him to answer the question.

9        MR. KING:  You want him to answer it again?

10        MR. YOUNG:  I would like him to answer the

11   question.

12        MR. KING:  He answered the question.  It may not

13   be what you want him to say, but that's what he

14   said.  So, you can ask him if he means something

15   different, that's fine.

16   BY MR. YOUNG:

17        Q.  Did you understand the question that the

18   court reporter just read?

19        MR. KING:  That's argumentative.  You don't have

20   to answer that question.  If you want him to add

21   anything -- he can add something if he'd like to,

22   Mr. Young.

23        MR. YOUNG:  You're really giving me no choice

24   here, Michael.

25        MR. KING:  Would you like him to explain his

1  answer further?

2      MR. YOUNG:  I would like him to give me a

3  straight-forward answer to the question that was

4  posed.

5      MR. KING:  He gave you the answer to the

6  question that was posed.

7      MR. YOUNG:  He did not.  Was that the goal was

8  the question, not what he did.  He told me a lot

9  about what he did.  That wasn't my question.

10      MR. KING:  It has been asked and answered.  You

11  want him to answer it further, is that what you are

12  asking?

13      MR. YOUNG:  Once again, no.  I would like a

14  straight-forward answer to the question that I

15  posed.

16      THE WITNESS:  Are you ready?

17  BY MR. YOUNG:

18      Q.  Yes.

19      A.  I'm not going to comment on what the goal

20  was, and tell you what my marching orders were.  So,

21  the goals have morphed and changed slowly over time.

22  So, I'm not going to be able to quote you what that

23  was in February of 2019.  I can tell you the manner

24  in which we went about our business was to get us

25  following up on those cases in a reasonable amount

1   of time.  So, you send out a letter and get no

2   response, then, you need to go.

3          If you want a correlation to that, I can

4   give you one.

5      Q.  Sure.

6      A.  Again, I told you there were two properties

7   on that street, two properties on the street that

8   had complaints.  They might have been from the same

9   person, I don't know, but they are right across from

10  each other.

11         The first one I sent out a letter, and got

12  in touch with someone who was responsible for the

13  property and met them there at the property.  And

14  that probably took two and a half weeks to set that

15  all up, and then, go out there.

16         It was the same time those letters went

17  out.  And I'm just not going to be able to tell you

18  exactly the number of days from Point A to Point B,

19  but that's when I followed up on the property at

20  4640.

21      Q.  So, if no courtesy letter is sent out in a

22  particular case, and there's no Notice of Violation,

23  what is the first notice, if any, that the property

24  owner receives that there is a violation?

25      MR. KING:  So, I'm going to object as overbroad,

1    Q.  On Page 31, Line 8 of your prior testimony,

2  you indicate -- and this is the only full, complete

3  sentence on Line 8:

4          "Sometimes a hearing isn't needed."

5    A.  That's correct.

6    Q.  And then, you follow-up with that going

7  into Lines 9 and 10, how you say:

8          "We follow-up with the property

9       owners just to clarify that they want a

10       hearing."

11    MR. KING:  Are you asking a question, Mr. Young?

12    MR. YOUNG:  I'm just reading his deposition

13  testimony right now.

14    MR. KING:  Fair enough.

15  BY MR. YOUNG:

16    Q.  Is that accurate, that you sometimes

17  follow-up?

18    MR. KING:  I'm going to object, because this

19  line of questioning has no relevance to the

20  questions pertaining to this inspection.  It is

21  post-inspection.  You've objected in Mr. Cupp's

22  deposition to the same types of question of Mr. Cupp

23  as to the administrative hearing process.  You can

24  answer the question, Mr. Smith.

25    MR. YOUNG:  I would ask Counsel not to interrupt

1   me when I'm asking -- at least let me ask the

2   question before you make your objections.

3       MR. KING:  I'm sorry, Mr. Young, I believed that

4   you were done with your question.

5       MR. YOUNG:  I was not.

6       MR. KING:  I apologize.

7   BY MR. YOUNG:

8       Q.  We were talking about your prior deposition

9   testimony.  You said, Page 31, Lines 9 through 10:

10              "We follow-up with property owners

11              just to clarify that they want a

12              hearing?"

13          What did you mean by that?

14       MR. KING:  Objection.  So, I'm going to object.

15   That's Page 31.  It is portions of the testimony

16   given by the witness, which were comprehensive.  You

17   can answer the question if you understand it.

18       THE WITNESS:  What I mean by that, and this is

19   something that I have to split hairs on this, what

20   we do now, and how we approach it now, and the

21   minutiae, and the nature and details that I

22   understand for today being here over three years,

23   versus then, being there for over six months, my

24   details are way better.

25              But we also, because more of our

1   inspectors have more experience, we make contact

2   with the owners and clarify, "what is it

3   specifically you want to appeal? " And only

4   because -- it's in process, we are not slowing

5   anything down.  We are just trying to clarify,

6   because in the end, in the end, the owner has to pay

7   for the hearing.  And if it is not something they

8   want to spend their money on, and they can get the

9   problem solved without a hearing, either with

10   discussion with me, or discussion with a manager,

11   then, we want to clarify that and stop the spending

12   of the money, if we can, not stopping their ability

13   to have a hearing.

14        It is like sometimes, "I just want to know

15   if I can get my fine reduced."  Well, in certain

16   circumstances, you can't; and other circumstances,

17   you can.  And those are things that can be

18   discussed.  But if we don't find out what they are

19   actually appealing, or what they want a hearing

20   for -- the manager doesn't want to hold a hearing,

21   they want to know specifically, what do you want to

22   hold a hearing for.

23        And a lot of those are things that need to

24   be in front of a hearing.  And then, there's a lot

25   of that we can answer your question for you.  It is

1   simply customer service.  They don't need a hearing,

2   they just need to know more.  There may have been an

3   error in our communication, and something they

4   needed to know.  That's what that was about.  Does

5   that make sense?

6   BY MR. YOUNG:

7       Q.  So, Mr. Cupp received a Notice and Order

8   from you at the time you conducted the February

9   15th, 2019 inspection; is that correct?

10      A.  I don't know that I can say that's correct.

11      Q.  At some point after the February 15th, 2019

12  inspection, did Mr. Cupp receive a Notice and Order

13  from you?

14      A.  I would have to ask him.

15      Q.  You have no recollection of when that

16  occurred?

17      A.  I can't answer that either.  I would like

18  to answer your question, but I don't think you are

19  going down a road I can help you on.

20      Q.  Why not?  Who issued the Notice and Order

21  to Mr. Cupp?

22      A.  I did.

23      MR. KING:  Hold on.  Hold on.  That's

24  argumentative.  You can answer the question.

25      THE WITNESS:  I issued the Notice and Order.

1   The Notice and Order was posted on the house.  The

2   pink copy was posted -- I'm sorry, on the garage,

3   right on the front of the garage.  That's where the

4   pink copy was.

5        I didn't see Mr. Cupp take that down, so I

6   don't know that he got it.  I would assume he got it

7   because in times after that, he responded to that in

8   some legal writings.

9        There were two other copies, a white and a

10  yellow, that were sent in the mail to the listed

11  property owner at the time, which was not Mr. Cupp.

12  So, that's why I can't say yes, he has a copy.

13  BY MR. YOUNG:

14      Q.  Okay.  So, let me rephrase the question.

15  You posted the Notice and Order at the 4640

16  Arlington property on February 15th, 2019?

17      MR. KING:  Okay.  That was covered in the prior

18  deposition and you just heard it from him today.  It

19  has been asked and answered and it's cumulative.

20  You can answer again.

21  BY MR. YOUNG:

22      Q.  Thank you.

23      A.  Yeah, that's what I said.

24      Q.  Okay.  And you indicated that sometime

25  after that, Mr. Cupp responded to the Notice and

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   Order by sending legal writings to your department;

2   right?

3       MR. KING:  That's been asked and answered in the

4   prior deposition and he just said that today.  You

5   can answer again.

6   BY MR. YOUNG:

7       Q.  Thank you.

8       A.  Yes, sir, that's what I said.

9       Q.  Did you read any of those writings that Mr.

10  Cupp sent to your department?

11      MR. KING:  Same objections.  You can answer

12  again.

13      MR. YOUNG:  I didn't ask him that before.

14      MR. KING:  No, no, but Mr. Cupp did, so it has

15  been covered already.

16      MR. YOUNG:  I don't believe Mr. Cupp did.

17      MR. KING:  Okay.  So, he received a letter and

18  he passed it up to his manager.  That's testimony he

19  gave before.

20      MR. YOUNG:  That wasn't my question.

21      MR. KING:  Of course it was.

22      MR. YOUNG:  No, it wasn't.

23      MR. KING:  You asked him if he received

24  something from Mr. Cupp, and he said he did in the

25  prior deposition.

1       MR. YOUNG:  That wasn't my question.  Sir, that

2   was not my question.  I asked him if he read Mr.

3   Cupp's letter, not what he did with them.

4       MR. KING:  You can answer the question again.

5   BY MR. YOUNG:

6       Q.  Thank you.

7       A.  I believe I read them at the time, yes.

8       Q.  When you read these writings that Mr. Cupp

9   sent to your department, did you consider them to be

10  a request for a hearing?

11      MR. KING:  Okay.  So, I'm going to object.  It

12  has already been covered, not relevant to the issue

13  of the inspection of February 15th, 2019, as set out

14  in your objections to Mr. Cupp's response.

15      MR. YOUNG:  Thank you.

16      MR. KING:  And I'm just stating my objection.

17  You can answer the question.

18  BY MR. YOUNG:

19      Q.  Thank you.

20      A.  I'm going to say I don't recall having

21  enough knowledge to make that decision.  I made sure

22  that I sat with my supervisor and Senior Inspector

23  Pelleriti and had them review them, so that they

24  knew what the documents said.  And I'm honestly not

25  recalling what their decision was.  I'm just not.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1        Q.  Do you recall if you or anyone else

2   followed up with Mr. Cupp to clarify whether he or

3   not wanted a hearing?

4        A.  I did not.  It wasn't -- it was taken out

5   of my hands at that point.  The process was

6   different at that time and it was handled by -- I

7   know Mark Franceschi had his hands in it, the

8   supervisor, and I know that Tyra Harrington did, but

9   I'm sure that was also reviewed immediately by

10   County Counsel, and if I remember right it went

11   through Risk, but I'm not sure about that.

12        Q.  Okay.  So, do you know if anyone else in

13   your department followed up with Mr. Cupp to clarify

14   whether these writings were requesting a hearing?

15        MR. KING:  Same objections.  You can answer.

16        THE WITNESS:  I don't know if they did or not.

17   BY MR. YOUNG:

18        Q.  You don't know, okay.

19            In your capacity as a Code Enforcement

20   Inspector with the County of Sonoma, do you have the

21   authority to get the inspection warrant on your own,

22   or is that handled by someone else in your

23   department?

24        MR. KING:  That was covered previously in his

25   prior deposition.  You can answer again.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      THE WITNESS:  Lawfully, I have the capacity to

2   do it myself as a Code Enforcement Inspector.  Our

3   practice is that we go through supervision, and

4   there are two code enforcement inspectors, now I

5   have to say they are now both seniors, that write

6   their own, but generally, Mark, the supervisor,

7   writes the inspection warrants.

8   BY MR. YOUNG:

9      Q.  So, help me to understand what the process

10   is in your department for obtaining an inspection

11   warrant.

12      MR. KING:  Okay, so I'm going to object, and

13   instruct the witness not to answer this portion.

14   This area has nothing to do with the search or the

15   inspection on the February 15, 2019.  It goes beyond

16   the scope.  It has been objected to.  The scope has

17   been set by you in the deposition of Ronald Cupp.

18   Unless you can give me a reason why this has

19   something to do with that inspection, I'm going to

20   object and not let the witness answer.

21      MR. YOUNG:  Okay.  Madam Court Reporter, at this

22   point I'm going to suspend the deposition for the

23   purpose of alerting the judge to Counsel's behavior.

24   He has objected numerous times in this deposition

25   without grounds, and he is now instructing the

1   witness not to answer a question that is a perfectly

2   legitimate objection.

3        MR. KING:  Again, what's the basis for the

4   objection?  So, for the reason why you are going to

5   ask that, for the inspection warrant, which was not

6   done until July 2020, and had nothing to do with

7   this inspection, why is that relevant to this case?

8            And I'm going to read from my questions of

9   Mr. Cupp from his deposition, Page 173, I asked:

10               "You had an appeal hearing with

11               regard to this particular notice; is

12               that right?

13               Mr. Young:  Objection, asked and

14               answered.  I fail to understand what

15               the relevance is in whether Mr. Cupp

16               had an appeal hearing or not to a case

17               that, as you well know, involves

18               unreasonable search and trespass.

19               There is no longer a due process claim

20               in this case, or am I mistaken?

21               Mr. King:  Are you going to let him

22               answer the question or not?

23               Mr. Young:  I'm not going to let

24               you continue to go down this road much

25               further, I will tell you that" --

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1        And we had more objections on the following

2    page, and you wouldn't let him answer the question.

3    So, I'm going to be happy to let you give me a

4    reason why the inspection warrant issues have

5    anything to do with this case, and I'll listen to

6    your reason, and I will be happy to let him answer

7    if there is a reason.

8        MR. YOUNG:  The reason is in this case there was

9    no inspection warrant obtained for the February 15,

10   2019 inspection.  So, I'm simply trying to find out

11   what the process is for obtaining an inspection

12   warrant.  We can narrow it down to at the time of

13   the February 15, 2019 inspection, if that helps.

14       MR. KING:  That's fine, Mr. Young, you can ask

15   him questions if he knows the process for obtaining

16   a warrant then.  The key question is -- you said

17   already, there wasn't one obtained.  So, I don't

18   know what the purpose is of finding out what the

19   basis was or the way of going about doing it in

20   February 2019, but I'll let him answer those

21   questions.

22       MR. YOUNG:  What questions are you going to let

23   him answer?

24       MR. KING:  You just gave me the guidelines, you

25   said what the process was in February 2019.

1    property that you go to is the owner.  Sometimes it

2    is not.  In this case, who I ran into was not the

3    owner.  But my assumption was I was going to knock

4    on the door and talk to the owner when I saw a car

5    out there and heard the noise coming from inside the

6    garage structure, I was going to talk to the owner

7    and see what was going on, and ask him a few

8    questions.  That was my goal.

9            When I could see what I saw, and talked to

10    the gentleman for -- I don't know, was it two

11    questions or one question, or whatever it was I

12    asked him, and walked back off the property and saw

13    enough to know that the reporting party had

14    described what was going on, and I could see what

15    was going on the property, from my view and public

16    access point, I wrote the Notice and Order and put

17    it on the house.  My goal was to go talk to the

18    owner when I went there.

19        MR. YOUNG:  I would like to take a break for

20    lunch, if that would be all right.

21        MR. KING:  That's fine, sir, but how long would

22    you like to take?

23        MR. YOUNG:  Madam Court Reporter, what would

24    suit you?

25        THE REPORTER:  Thirty minutes is fine.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1       MR. YOUNG:  Let's say 12:35, would that be all

2   right?

3       MR. YOUNG:  That's fine.

4       MR. KING:  Okay.

5       THE REPORTER:  We are off the record at 12:03.

6             (Lunch recess taken.)

7       THE REPORTER:  We are back on the record at

8   12:36.

9   BY MR. YOUNG:

10      Q.  So, Mr. Smith we took a short lunch break.

11  So, I'll ask you at this point, is there any prior

12  testimony that you wish to modify or add to at this

13  point?

14      A.  No, sir.

15      Q.  How did you become aware that there was a

16  problem at 4640 Arlington Avenue that needed your

17  attention?

18      A.  We received a report of construction

19  without permit.

20      Q.  And when did you become aware of that?  I'm

21  sorry.  Strike that.

22        When did you receive the report?

23      A.  I'd have to look at my notes.  I don't know

24  the date.

25      Q.  Can you give me a rough idea?

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  Probably a couple of weeks before I went to

2   the house.

3      Q.  And that's your best recollection?

4      A.  Again, I'd have to look at my notes.  I

5   don't capsulate that stuff in my brain.  I use my

6   notes to benefit me so I can use my brain for other

7   things.  I don't remember the minutiae of every

8   call.  I mean, I can accurately tell you what it

9   says from the notes.  I'm not looking at anything at

10   this point.  If you want me to, I will look at it

11   and I can tell you when it was done.

12      Q.  Well, I'm just trying to get your

13   recollection separate and apart from the report you

14   referenced.  You said about a couple of weeks would

15   be your best estimate?

16      A.  That's an estimate.

17      Q.  Okay.  So, after you became aware of that

18   there was construction without a permit happening at

19   the Arlington Avenue property, what is the next

20   thing that you did with respect to the property?

21      A.  We sent out a courtesy letter.

22      Q.  And what did you do after that?

23      A.  I didn't get a response, so I went out to

24   the property.

25      Q.  So, when you went out to 4640 Arlington

1   Avenue that was on February 15, 2019.  How long were

2   you at the property?

3      A.  Hum, I'm saying less than 30 minutes, but

4   it could have been less than 15.

5      Q.  When -- back in February of 2019, when you

6   would go visit a property, did you use your own

7   vehicle or is there a County-issued vehicle that you

8   would use?

9      A.  At that point I was using a County vehicle.

10  I wouldn't use the word "issued".

11     Q.  Okay.  But it definitely wasn't your own

12  personal vehicle?

13     A.  No, it was not.

14     Q.  Back in February of 2019, were you keeping

15  any kind of log when you would arrive and leave the

16  properties that you would inspect?

17     A.  No, sir.

18     Q.  And back in February of 2019, were you

19  required to keep any sort of time sheets that would

20  reflect when you would go out, what time you would

21  go out to a property, and when you would get back?

22     A.  No, sir.

23     Q.  So, I want to read from your prior

24  deposition testimony on Page 39, Line 7 to 11.

25  You're talking again about the process of getting

ANDREW SMITH Vol II                                    JOB NO. 207320
DECEMBER 07, 2021

1    new cases into your department, and you say:

2              "And I get new cases and those new

3              cases are a variety of different cases

4              and they have -- they require different

5              levels of expedience.  Some require

6              today.  Some require within 24 hours.

7              Some require as soon as you have time

8              to get to it."

9         Do you recall that testimony?

10        A.  I don't recall that testimony, but that's

11   correct.

12        Q.  Okay.  So, how was the 4640 Arlington

13   property characterized, based on that, when you

14   learned that there was a problem there?

15        MR. KING:  I'm going to object as vague and

16   ambiguous.  You can answer.

17        THE WITNESS:  So, I will tell you this:  You

18   gave me three, three different types, today, within

19   24, and later.  This was in the latter, the last

20   one, when you get to it.  I sent out a courtesy

21   letter.  It wasn't a house that had burned to the

22   ground, and it was a dangerous and an attractive

23   nuisance.  And it wasn't a house that had an active

24   leak of sewage or similar type of dangerous

25   activity.  So, it wasn't those first two; it was in

1   enhancement.  So, some things are not exactly right.

2      Q.  Right.

3      A.  But height, depth, and thickness and stuff,

4   all get contorted.

5      Q.  Right.  There is some distortion that

6   happens in the photographs of Google Earth.  Is that

7   what you are saying?

8      A.  Yeah.  But I knew this was that -- you

9   could tell me you were working on this case, and

10   show me this picture, I would know that was the

11   property.  I've been around it.

12      Q.  Okay.  I'll show you this next photograph

13   we'll mark as Exhibit 18.

14         (Plaintiff's Exhibit 18 was marked.)

15   BY MR. YOUNG:

16      Q.  This is another aerial photograph taken

17   from a different vantage point showing 4640

18   Arlington Avenue.  Again, this is from Google Earth.

19   Do you see where it says on the photograph 4640

20   Arlington Avenue?

21      A.  Yes, I do.

22      Q.  And so, the road that is depicted in the

23   left sort of one-third of the -- not quite halfway

24   point of the photograph, that's Arlington Avenue?

25      A.  Yes, it is.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      Q.  And so, it looks like Arlington Avenue sort

2    of stops towards the top of the photograph.  Do you

3    see that?

4      A.  Yes, I do.

5      Q.  What is the -- what is the surface of the

6    road made out of at Arlington Avenue in this

7    location?

8      A.  Which location?

9      Q.  Well, how about the location -- I'll show

10    you another picture.  Strike that question.  I'll

11    show you a better picture here in a minute.  In

12    fact, let's go ahead and do that.

13          (Plaintiff's Exhibit 19 was marked.)

14    BY MR. YOUNG:

15      Q.  So, this is a photograph again from Google

16    Earth.  Do you recognize what's depicted in this

17    photograph?

18      A.  Yes, I do.

19      Q.  And you would agree this is depicting a

20    portion of Arlington Avenue?

21      A.  That's correct.

22      Q.  And does, to the best of your knowledge,

23    does this photograph accurately depict Arlington

24    Avenue in that location?

25      MR. KING:  Okay, so I'm going to object only as

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   to time, since we don't have any times on these, but

2   you can answer the question.

3       THE WITNESS:  At one time, it was accurate.  I

4   mean, if you want to talk about pavement and that's

5   all you want to talk about --

6   BY MR. YOUNG:

7       Q.  Pavement is one thing and we can talk about

8   pavement.  What I want to do though, is -- well,

9   there we go.  So, for the record, I clicked the zoom

10  button once just to get a closer view of the

11  photograph, and it appears to me in the middle of

12  the photograph, it looks like there is a yellow sign

13  that says "End".  Do you see that?

14      A.  Yikes.  Hold on.  Oh, yeah, I see it.

15      Q.  Okay.  Do you know what the road surface is

16  composed of at the point where that "End" sign is

17  posted?

18      A.  Right about there, it transitions to

19  hard-packed gravel.

20      Q.  Okay.  As the photograph depicts before

21  that, it looks like it is asphalt?

22      A.  Mostly, yes.

23      Q.  Mostly, yeah, okay.  And let me zoom out

24  again.  To the left of the photograph, we see it

25  looks like a house of some sort.  It is partially

1   obscured by trees.  Do you see that?

2        A.  Yeah, 4640 Arlington.

3        Q.  So, that's the 4640 Arlington residence?

4        A.  It is the house.  I'm not sure what date

5   that is.  It doesn't look like that now.

6        Q.  Do you know whether -- strike that.

7            At the point where the "End" sign is

8   posted, do you know if the road beyond that is

9   considered a private road?

10       A.  No, I don't.  There's no signage there to

11   say anything about not County maintained, private

12   road, no trespassing, nothing like that.

13       Q.  What does the "End" sign mean to you?

14       A.  Well, in this particular picture, it means

15   to me that the road used to end there.  I don't know

16   what it would be there for now.  I don't even know

17   if it is there at this time, talking about today.

18   And I don't know if it was there on February 2019.

19       Q.  That's going to be my question, whether you

20   know that sign was there in February of 2019.  So,

21   you don't know if that was there or not?

22       A.  So, I'll give you an example.  When I went

23   to the property across that street, which is that

24   driveway where that telephone pole is, just beyond,

25   I parked where that sign was.  So, I don't recall

1   that sign being there.

2       Q.  Okay.  So, are you saying that you don't

3   think the sign was there when you went to that

4   property, or you just don't recall whether it was

5   there?

6       A.  I don't recall it being there.

7       Q.  Okay.

8       A.  Your contention could be it was there, and

9   you can show me a picture and prove me wrong, but I

10  don't recall it.  So, it is an accurate statement to

11  say I don't recall it.

12      Q.  Okay.  So, it would be speculation on your

13  part as to whether the sign was there or not in

14  February of 2019?

15      A.  Yes.

16      Q.  I'll show you this next exhibit we'll mark

17  as 20.

18        (Plaintiff's Exhibit 20 was marked.)

19  BY MR. YOUNG:

20      Q.  This photograph I'll represent to you is

21  also depicting the Arlington Avenue property.

22  There's no date on it.  So, I'm just going to ask

23  you in general, do you recognize that's the

24  Arlington Avenue property that we've been talking

25  about?

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  Yes, I do.  It is.

2      Q.  So, when you went out to the Arlington

3   Avenue property on February 15, 2019, where did you

4   park your vehicle?

5      MR. KING:  Okay, these questions have been asked

6   already in the prior deposition.  You can answer.

7      THE WITNESS:  I'm going to tell you, if you look

8   real closely at this picture, there's a gate that's

9   kind of cut out in the fencing there, and there's a

10   gate that rolls back and forth.  On each side of

11   that gate, there's piles of gravel, sand, course

12   sand.  I parked right in that area there.  These

13   piles weren't there then and that gate wasn't there

14   then.

15   BY MR. YOUNG:

16      Q.  Okay.  So, other than those differences you

17   just testified to, does this photograph accurately

18   depict what you recall the Arlington Avenue property

19   looking like?

20      MR. KING:  I'm going to object as overbroad as

21   to scope, time, and observations.  You can answer.

22   BY MR. YOUNG:

23      Q.  As of February 15, 2019.

24      A.  No, it is not correct.

25      Q.  So, in what respects is it not correct?

1  you can mark on the photograph.

2     MR. KING.  Okay, the process which is being

3  proposed, I'm objecting to for a variety of reasons.

4  The witness is not here to make these drawings.

5  He's not doing this on a photograph that depicts the

6  way the property looked in 2019 when he was out

7  there, on February 15, 2019.  He has testified as to

8  what the differences were as far as he can tell from

9  an aerial photograph.  He can go ahead and do this

10  with my objections.

11     THE WITNESS:  I'm having a hard time seeing how

12  I would make the marks on your little, tiny

13  photograph.  I'm having a hard time doing that.

14     MR. KING:  Do the best you can.  I'm objecting

15  to it.  You can do the best you can.

16     THE WITNESS:  Okay.  I will make marks on there,

17  but I guarantee you we can find better data just

18  using Google Earth.

19  BY MR. YOUNG:

20     Q.  I'll represent to you there's no street

21  view of the Arlington Avenue property on Google

22  Earth because of that change in the roadway.  So,

23  this is kind of what we have to work with in terms

24  of that.

25     A.  Do you want me to mark everything or just

1   what we talked about?

2      Q.  Just mark what you talked about.

3      A.  Because there is more, but that's fine,

4   just what I talked about.

5      Q.  Okay.

6      A.  And just to be clear, I know we can't go

7   out there on the street view, but the overhead view,

8   you can back date on the calendar, and click back

9   until you can get approximately the right date.

10   That's also what you can do.  I haven't done it for

11   this property, but I have done it for most of my

12   properties that I need an aerial view of.

13      Q.  If you can mark on the photograph maybe an

14   X, if you could, in the approximate location when

15   you went out there on February 15, 2019.

16      A.  How about if I use a square?

17      Q.  Sure.

18      A.  That little square right there.  Do you see

19   that?

20      Q.  Yeah, okay.  So, when you parked your

21   vehicle -- strike that.

22         After you parked your vehicle, did you get

23   out of your vehicle?

24      A.  Yes.

25      MR. KING:  Already been asked and answered in

1   prior testimony.  You can answer again.

2        THE WITNESS:  Yes, I did.

3   BY MR. YOUNG:

4        Q.  And at that point did you believe you were

5   on the right-of-way for the property?

6        MR. KING:  All been covered previously.  You can

7   answer again.

8        THE WITNESS:  I believe that was the

9   right-of-way.

10   BY MR. YOUNG:

11        Q.  On what did you base that belief on?

12        A.  Roadway surface, lack of signage stating

13   anything different, no gates, no no trespassing

14   signs.  No reason to believe different.

15        Q.  Okay.

16        MR. KING:  Mr. Young, could I have a question

17   answered, if you could.  Is this new 20, is that

18   going to be retained somehow?

19        MR. YOUNG:  What do you mean "retained somehow"?

20        MR. KING:  Well, you have the witness marking as

21   best he can with the tool areas on the photograph.

22   I'm just wondering if that's going to be retained as

23   an exhibit or not.

24        MR. YOUNG:  It is.  And what I'm going to do,

25   and this is for the record, there's a green button

1  that says save annotations, which I'm going to

2  select, and I believe that will save this as

3  probably  -- it will give us the option to call it

4  20-A.

5     MR. KING:  That's fine.  I just want to make

6  sure we're going to have a clear record.  Thank you

7  so much.

8     MR. YOUNG:  So, it is giving me the option to

9  mark this as 20-A, which I'll do.  Okay.

10        (Plaintiff's Exhibit 20-A was marked.)

11  BY MR. YOUNG:

12     Q.  Let me exit out of the annotations on this

13  photograph.  Okay.

14        So, now we're looking at Exhibit 20, which

15  is the same photograph without your annotations that

16  you put on 20-A.  You indicated the differences that

17  you talked about in the property and where you

18  parked your vehicle.  After you got out of your

19  vehicle, where did you go next?

20     MR. KING:  That's been asked and answered and

21  discussed in the prior deposition.  You can answer.

22     THE WITNESS:  I walked, turned, called out.

23  BY MR. YOUNG:

24     Q.  Okay.  So, what I would like you to do on

25  this photograph, and let me click annotate exhibit

1  again, if you can, mark on the photograph where you

2  walked after you got out of your car, or your

3  vehicle.

4      A.  (Witness drawing.)

5      Q.  Okay.  So, let the record reflect the

6  witness drew some sort of red, kind of, upside-down

7  L shape.

8          So, you -- the point at the bottom of the

9  picture where you start the red line, that's where

10  your vehicle was parked, as you indicated on the

11  other photograph.  So, it looks like you walked up

12  towards the property, and then, turned right.  And

13  did you walk through a gate of some sort or was it

14  just open?

15      MR. KING:  Just to be clear, I have the same

16  objections to this exhibit as previously stated, and

17  the witness has already testified to what he did in

18  the prior deposition.  You can answer again.

19      THE WITNESS:  The gate was not up.

20  BY MR. YOUNG:

21      Q.  Okay, it was just open, okay.  So, where

22  your line goes to the right of it and it comes to a

23  stop, was there a doorway at that point or some sort

24  of an opening in that structure?

25      MR. KING:  Same objection.  You can answer.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1     THE WITNESS:  There's a side door to the garage.

2   I call it, for lack of a better word, man door

3   instead of car door.  The side door to the garage

4   was open.  There's a concrete pad.  There isn't a

5   whole pathway there -- I can't see from this

6   picture, and I can't recall if there was a path all

7   the way along there.  There might very well be.  And

8   there was a tool box sitting outside that open door.

9   There was noise coming from the inside.  So, that's

10   where I focused on.

11   BY MR. YOUNG:

12     Q.  What sort of noise was coming from the

13   inside?

14     MR. KING:  It has been discussed in the prior

15   deposition.  You can answer again.

16     THE WITNESS:  Construction noise.

17   BY MR. YOUNG:

18     Q.  Can you be more specific?

19     A.  I don't recall whether it was hammering or

20   machines or saws.  It was construction noise.  I

21   didn't note down the actual source of the noise.  It

22   wasn't voices or music.  It was construction noise.

23     Q.  But you don't recall specifically whether

24   it was banging of a hammer or machines or anything

25   like that?

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  No, I do not.

2      Q.  And so, the door you said -- your testimony

3   is that the door was open, the man door was open.

4   You heard the noises coming from inside there.  What

5   did you do next?

6      MR. KING:  It has been covered in the prior

7   deposition.  You can answer again.

8      THE WITNESS:  When I -- where I showed the

9   corner there of the right angle, and I make that

10   right angle to turn right, I called out, because I

11   want to address the person at the first optimal

12   moment.  If I can say, "hey, anybody here" and the

13   owner pops their head out of the door, all the

14   better.  And again, I didn't get any response from

15   that.  I walked towards the open door and the noise

16   to see if I could get the attention of the person

17   making the noise.

18   BY MR. YOUNG:

19      Q.  So, while you are out there, you took a

20   number of photographs; correct?

21      A.  Yes.

22      Q.  Okay.  Can you -- by reference to this

23   photograph, can you tell me where you were when you

24   took those photographs?

25      MR. KING:  Okay.  That's overbroad as to "where

1  he was when he took those photographs" because they

2  are -- as discussed in the prior deposition, they

3  were taken in different locations.  You can answer.

4      THE WITNESS:  I think the hard part is I took

5  pictures from different locations.

6      MR. YOUNG:  So, let me show you, let me save

7  these annotations and we will call this 20-B.

8         (Plaintiff's Exhibit 20-B was marked.)

9      MR. YOUNG:  Bear with me just a second because I

10  want to show you photographs that were marked as

11  exhibits previously at your deposition.  So, I'm not

12  going to be marking them here today.  So, I'll be

13  sharing my screen in a different way, essentially.

14      MR. KING:  Well, are you intending to ask

15  questions about the photographs that were already

16  asked?

17      MR. YOUNG:  We'll see, won't we?

18      MR. KING:  No, I don't think we'll see.  I'm

19  going to object to this line of questioning because

20  it has already been covered in the prior deposition.

21      MR. YOUNG:  You don't even know what I'm going

22  to ask.

23      MR. KING:  It doesn't make any difference, Mr.

24  Young.  They have already been shown in deposition

25  and discussed with the witness, they've been asked

1  and answered.  I'm going to let you ask the

2  questions.

3      MR. YOUNG:  You don't even know what I'm about

4  to ask.

5      MR. KING:  Mr. Young, your client asked all the

6  line of questions, which is the objection you raised

7  in his deposition.  I'm making the objection and you

8  can ask him questions.  I'm going to let him answer

9  them.

10      MR. YOUNG:  Okay.  Thank you.

11      MR. KING:  It is the same objections that you

12  made.

13      MR. YOUNG:  Thank you.

14  BY MR. YOUNG:

15      Q.  Okay.  So, let me share my screen.  Okay.

16  So, Mr. Smith, can you see this photograph?

17      A.  Yes, I do.

18      Q.  So, where were you physically located when

19  you took this photograph?

20      MR. KING:  Can you just identify it please, sir.

21      MR. YOUNG:  Okay, sorry.  This is Exhibit 5 to

22  the prior deposition of Mr. Smith.

23      MR. KING:  Thank you very much.  I'm going to

24  have a running set of objections.

25      MR. YOUNG:  I get that.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1       MR. KING:  Okay.

2       THE WITNESS:  I was standing in the right-of-way

3   when I took this photograph of the garage structure.

4   BY MR. YOUNG:

5       Q.  And did you take this photograph before or

6   after you walked up to the -- well, strike that.

7           In the photograph towards the right-hand

8   side, there's kind of gray, it looks like a doorway.

9   Do you see that?

10      A.  Yes, I do.

11      Q.  Is that the man door you referred to

12  earlier?

13      A.  Yes, it is.

14      Q.  And this photograph is date stamped

15  2/15/2019; correct?

16      A.  Correct.

17      Q.  Did you take this photograph before or

18  after you walked up to the man door?

19      A.  I don't recall.

20      Q.  But you're sure you were in the

21  right-of-way when you took this photograph?

22      MR. KING:  That's argumentative.  You can answer

23  again.

24      THE WITNESS:  It is obvious I was in the

25  right-of-way when I took that photograph, yes.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   BY MR. YOUNG:

2      Q.  Okay.  And it is a little bit dark, but

3   next to the man door there appears to be sort of a

4   square or rectangular object.  Is that the tool box

5   you were talking about?

6      A.  Yes, sir.

7      Q.  Okay.  So, bear with me just a second.

8   I'll make this larger.  I'm showing you what was

9   previously marked as Exhibit 6 to your prior

10   deposition.  Do you recognize this photograph?

11      A.  Yes, I do.

12      Q.  So, this photograph also is showing you a

13   portion of the Arlington Avenue property; correct?

14      A.  Yes, it is.

15      MR. KING:  I'm going to have the same running

16   objection to this photograph as the others.  Thank

17   you.

18   BY MR. YOUNG:

19      Q.  Where were you physically located when you

20   took this photograph?

21      A.  In the area of the carports.

22      Q.  Were you on the property at the time you

23   took this photograph?

24      A.  I would tell you that I'm not sure, but I

25   believe I was.  The fence in that area was not

 1   complete.  And I'm not sure if I was standing at the

 2   fence line or inside the fence line taking the

 3   picture, just trying to get the most I could get

 4   into one shot.

 5       STENO TECH ASSISTANT:  Pardon my intrusion,

 6   Counsel.  Just a head's up, my timer went off for

 7   the page refresh reminder.  We have a few minutes,

 8   but definitely within the next five to ten minutes,

 9   if you have a moment to pause.  It takes less than a

10   minute to do this refresh.

11       MR. YOUNG:  Why don't we go ahead and do this,

12   because I don't want it to disconnect us, whatever

13   it does.  What do we need to do?

14       STENO TECH ASSISTANT:  Let's go off the record.

15       MR. YOUNG:  Yes, go off the record.

16       THE REPORTER:  Off the record at 1:16 p.m.

17              (Recess taken.)

18       THE REPORTER:  Back on the record at 1:18.

19   BY MR. YOUNG:

20       Q.  Okay.  All right.  We took a short little

21   break there to refresh the video conferencing

22   system.  Let me share my screen again.  We were

23   looking at Exhibit 6, what was marked as Exhibit 6

24   to your prior deposition.  I'm sharing that

25   photograph with you again, Mr. Smith.  Do you see

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   that?

2        A.  Yes, I do.

3        Q.  This is also date stamped 2/15/2019 on this

4   photograph; correct?

5        A.  Kind of small there, but it looks exactly

6   like that, yeah.

7        Q.  Okay.  So, in this photograph, there's a

8   number of objects that are depicted.  It looks like

9   they are underneath a carport.  Do you see that?

10        A.  Yes, I do.

11        Q.  Do you recall what those objects were when

12   you took this photograph?

13        A.  Generally speaking, it was construction

14   debris, but there were some carpet, lumber, there

15   was trash, cardboard, and that kind of thing.  Those

16   are cabinets, at least one of them was a cabinet to

17   the left of the screen, with the white side and tan

18   back.  And whether those were being used in the main

19   house or being used in the garage structure, I don't

20   know.

21        Q.  Okay.  So, you don't know whether those

22   were part of the garage structure or had any

23   connection with the garage structure?

24        A.  No, I don't.  No, I didn't ask any

25   questions.  I didn't go into the house.  I couldn't

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   put pieces together.  I just could see it was

2   construction debris.

3        Q.  Okay.  Sorry, I just had a little glitch

4   there for a second.  So, I'll share this next

5   photograph with you.  This was marked as Exhibit 8

6   to your prior deposition testimony, and ask you if

7   you can see this photograph.

8        A.  Yes, sir.

9        MR. KING:  The same running objection to the use

10   of this photograph.  Thank you.  Go ahead.

11   BY MR. YOUNG:

12        Q.  Where were you physically located when you

13   took this photograph?

14        A.  In the area of the carports.

15        Q.  You were physically underneath the carport;

16   is that correct?

17        A.  I don't know if I was or not.  I'm not sure

18   if that's either underneath or close to it.

19        Q.  So, these objects, these square objects

20   that we see in the photograph in the middle, would

21   it be fair to say these are the other side of those

22   cabinets that you identified in the previous

23   photograph?

24        MR. KING:  I'm going to object, just because of

25   the characterization of the objects, but go ahead.

1   BY MR. YOUNG:

2       Q.  Those are cabinets; correct?

3       A.  Those are cabinets.

4       MR. KING:  It was the characterization as

5   square, though.  That's all.  I wasn't saying they

6   weren't cabinets.

7   BY MR. YOUNG:

8       Q.  Okay.  And so, this photograph is taken

9   from the other side of those cabinets; correct?

10      A.  Correct.

11      Q.  Did you believe you were on the property

12  when you took this photograph?

13      A.  Was I on the property?  Yeah, I was on the

14  property.

15      Q.  Okay.  So, I'll share this next photograph

16  with you.  This was marked as Exhibit 10 to your

17  prior deposition testimony.  Can you see this

18  photograph?

19      A.  Yes, I can.

20      Q.  Okay.  And this photograph also bears date

21  stamp of 2/15/2019.  Do you see that?

22      A.  Yes, I do.

23      MR. KING:  I have the same running objection to

24  the use of this photograph.  Go ahead.

25  BY MR. YOUNG:

1   converted to a dwelling unit?

2       MR. KING:  Insofar as it covers --

3   BY MR. YOUNG:

4       Q.  On February, 15, 2019.

5       MR. KING:  Yeah, I understand.  Insofar as it

6   covers the prior deposition testimony and questions

7   asked, I'm objecting.  He can answer.

8       THE WITNESS:  So, I had a variety of pieces of

9   information, including the report from the RP, the

10  stuff that I observed while I was there, which

11  included one of the simplest things on one of the

12  photograph, I didn't point it out while I was

13  looking at it, because you didn't ask about it,

14  there is a dish on top of the building, which you

15  don't put in a structure that is detached to another

16  structure, unless it is used for dwelling space in

17  most circumstances.  And I say that because that

18  indicates dwelling.

19          The outside of the building had windows in

20  it that a garage wouldn't normally have.  It was

21  being converted.  And by the admission of the person

22  that there was in there, he was working on the

23  building, building it out at the direction of the

24  owner.

25          So, all of those bits of information, put

1    together, including the cabinets, and the

2    construction debris, showing all this, indicated to

3    me that there was a conversion of a garage

4    structure, from a garage a structure to a dwelling

5    structure.  And one of those violations is a change

6    of occupancy, which you're occupying that structure

7    for something other than a garage.

8    BY MR. YOUNG:

9        Q.  So, is it your testimony that the person

10   that was working there told you that he was building

11   out the garage into a dwelling unit?

12       A.  Nope.  He didn't say that.

13       Q.  Okay.  So, help me to understand what the

14   person that was there said to you.

15       A.  So, I don't have a recording of it, the

16   words that he said.  So, I could not give you an

17   exact quote.  It was information I gained from him.

18   I gathered all the information and used it.  That

19   was my testimony.

20       Q.  What did he say to you to the best of your

21   recollection?

22       MR. KING:  That's been covered in the prior

23   deposition.  It has been asked and answered.  You

24   can answer again.

25       THE WITNESS:  I don't recall the exact words.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   So, I can't answer that question.

2   BY MR. YOUNG:

3      Q.  But you just said you recall that he

4   admitted something to you, if I had heard you

5   correctly.  Is that right?

6      MR. KING:  Okay.  So, I'm objecting as

7   argumentative, asked and answered.  You can answer

8   again.

9      THE WITNESS:  We had a very short conversation,

10  very short, and I gathered all that information to

11  make that decision.  You asked why I made this

12  decision to write this on there, and now you are

13  asking for the words he said.  I don't have them.

14  BY MR. YOUNG:

15     Q.  Actually, what I'm trying to get at is a

16  little more specific than that.  In your answer you

17  said that one of the factors that led you to write

18  up this Notice and Order is that the person that was

19  there that you made contact with made some admission

20  to you about what he was doing.

21         I'm just trying to figure out or get your

22  best recollection what it was that person said to

23  you in regards to this admission that you are

24  testifying about.

25     MR. KING:  Objection, compound, and it is

ANDREW SMITH Vol II                                    JOB NO. 207320
DECEMBER 07, 2021

1   argumentative.  You can answer.

2       THE WITNESS:  And I gave you the best answer I

3   can.  I don't know the words he used.  I don't

4   recall them.  I recalled them at the time and I used

5   all of that information, some of which I have

6   photographs of, which were just shown, some of which

7   I have notes about, but I don't have the words that

8   he said.

9   BY MR. YOUNG:

10      Q.  Did you at any point after you announced to

11  the property, to the Arlington Avenue property, on

12  February 15, 2019, did you make any notes or

13  writings of any kind that memorialized what the

14  individual said to you that day?

15      A.  Yes, I did make notes.  I don't have them

16  in front of me, and I can't tell you what he said

17  based on those notes without looking at them.

18      Q.  Okay.  But the question is, did you make

19  notes of the conversation, not necessarily what was

20  said, but did you make notes about the conversation?

21      A.  I don't recall.  I mean, I'm guessing

22  you're either looking at them or not, you would

23  either know the answer to my question.  I don't have

24  an answer.

25      Q.  That's nonresponsive.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  I can't tell you.  I keep on saying that.

2  I don't know.  I'm trying not to be argumentative,

3  but you keep on hitting me with the same spatula, I

4  get upset.

5      Q.  So, I'll show you this next exhibit that

6  was previously marked as 13 to your prior deposition

7  testimony.  Do you see this document?

8      A.  Yes, I do.

9      Q.  And this document appears to be dated

10  February 15, 2019 down on the lower right-hand

11  corner; is that correct?

12      A.  That's correct.

13      Q.  And over to the left where it says Code

14  Enforcement Inspector, is that your signature?

15      A.  Yes, it is.

16      Q.  You filled out this Notice and Order also

17  on February 15, 2019?

18      MR. KING:  I'm objecting because this is the

19  same line of questioning that was asked of the

20  witness at the prior question.  You can go ahead and

21  ask further questions.  I'm objecting to them.  Go

22  ahead.

23  BY MR. YOUNG:

24      Q.  You can go ahead and answer.

25      A.  The question again?

1    Q.  This is one of the notices -- this is one

2  of the Notices and Order that you filled out on

3  February 15, 2019 with respect to the Arlington

4  Avenue property; correct?

5    MR. KING:  Same objections.  You can answer.

6    THE WITNESS:  Yes.  It is a Notice and Order for

7  construction without a permit, which is different

8  from the last one, which was specifically change of

9  occupancy.

10  BY MR. YOUNG:

11    Q.  Now, on this Notice and Order, where it

12  says Number 1, it says CWOP, construction without

13  permit, CWOP.  I'm assuming that's what that stands

14  for.

15    A.  That's correct.

16    Q.  "Remodel vacancy, SFD," I'm assuming that's

17  single-family dwelling, "and barn.  No permit."  Did

18  I read that accurately?

19    A.  You said "vacancy".  It is "remodel vacant

20  SFD and barn.  No permit."

21    Q.  Thank you for that clarification.  Okay.

22  How did you know that there was a remodel occurring

23  of a vacant, single-family dwelling?

24    MR. KING:  Okay.  So, that's the exact same line

25  of questioning, which was asked by Mr. Cupp at the

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   prior deposition.  You can answer the question.

2       THE WITNESS:  So, again, back to the reporting

3   party, we had some data from that stating that no

4   one was living there, and the work was going on on

5   the weekends.  And while standing in the spot where

6   you said I was taking the picture, looking at the

7   back side of the cabinet, I was looking over a fence

8   towards the single-family dwelling.  You could see

9   that in that picture, if you looked at the further

10   information in that picture.

11       And the windows weren't covered.  You could

12   see in there it appeared to be vacant, like it was

13   under construction.  There was no coverings on the

14   windows.

15       Didn't go any closer than that.  I stayed

16   outside of that fence line, that old redwood fence

17   line that was the dark gray color, not the new one

18   that was out towards the street.

19       And it appeared to match the description of

20   what the reporting party said, which that it was a

21   vacant residence that was under construction being

22   remodeled.

23   BY MR. YOUNG:

24       Q.  Okay.  So, was the basis for you concluding

25   that the single-family dwelling was vacant was

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   because there were no covering on the windows; is

2   that your testimony?

3        MR. KING:  Okay, he just told you why.  It has

4   been asked and answered.

5        MR. YOUNG:  I'm just trying to clarify.

6        MR. KING:  I understand that, but he's already

7   told you.  It has been asked in the prior

8   deposition.

9        MR. YOUNG:  I am trying to clarify.

10        MR. KING:  Hold on a second.  I'm not done with

11   my objection.

12        MR. YOUNG:  You don't need to raise your voice.

13        MR. KING:  You know, Mr. Young, you're raising

14   your voice, too.

15        MR. YOUNG:  You have been doing this, you have

16   been raising your voice throughout this.  You get so

17   animated and really for no reason whatsoever.  I'm

18   just saying you don't need to shout.

19        MR. KING:  Mr. Young, I can't talk over you

20   unless I raise my voice.  When you interrupt me, I'm

21   going to raise my voice.  So, the objection is this

22   has already been covered at length in the prior

23   deposition.  It is cumulative.  It has been asked

24   and answered.  And he can answer the question again.

25   BY MR. YOUNG:

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      Q.  Go ahead.

2      A.  So, you specifically asked if I assumed

3  from looking at the windows not having coverings,

4  that it was being -- it was under construction.

5  Nice try.

6      Q.  No.  No.  No.  I'm sorry to interrupt you,

7  but that's not what I said.

8      A.  Okay, then, what did you say?

9      Q.  My question was did you base your

10  conclusion that the single-family dwelling was

11  vacant based on the fact that there was no window

12  coverings on the windows.

13      MR. KING:  So, same objections as previously

14  stated.  He did answer that.  Go ahead and answer

15  again.

16      THE WITNESS:  No.  The RP told us it was vacant.

17  Said it was being worked on on the weekends.  The

18  windows were not covered.  You could see into the

19  house that it appeared to be unoccupied, like there

20  was not furniture set out.  It was under

21  construction.  There was dirt, debris that you could

22  see, not on the ground, but in the windows.  You

23  could see that there was stuff in there,

24  construction materials.

25      I couldn't tell you what it was.  It is

ANDREW SMITH Vol II                                          JOB NO. 207320
DECEMBER 07, 2021

1   hard to describe exactly what was there when you

2   can't zoom in with the particular photograph

3   instrument that you have.  I could see with my eyes

4   and it looked to me as if the house was under

5   construction.

6   BY MR. YOUNG:

7        Q.  So, directing your attention back to

8   Exhibit 7, which I showed you before, and I'll show

9   you again -- I'm sorry, I'm not sure if I did show

10   you Exhibit 7.  Let me just say this was previously

11   marked as Exhibit 7 to your deposition.  I don't

12   believe I showed you this before.

13        MR. KING:  Yes, we have gone over that in this

14   deposition, and Mr. Cupp clarified that.

15        MR. YOUNG:  No, Michael, I did not show him this

16   photograph.  I showed him a similar but different

17   photograph.

18        MR. KING:  It has been covered by Mr. Cupp in

19   the previous deposition.

20        MR. YOUNG:  Okay.  Okay.  Could I please ask a

21   question?

22        MR. KING:  Go ahead.

23   BY MR. YOUNG:

24        Q.  So, in this photograph, there is a house,

25   it depicts a house; correct?

1       A.  Yes, it does.

2       Q.  And that's the 4640 Arlington house;

3  correct?

4       A.  Yes, sir.

5       Q.  And you took this photograph; correct?

6       A.  Yes, I did.

7       Q.  In the middle of photograph, it shows a

8  wall as far as the house and there is some windows.

9  Do you see that?

10       A.  Yes, I do.

11       Q.  Are those the windows that you looked

12  through to determine that the house was vacant?

13       A.  Those windows, and the windows that you

14  could see from the other end of the house from

15  outside the house on the right-of-way.

16       Q.  Was there any sort of reflection on the

17  windows when you were there in February of 2019?

18       A.  I don't recall.

19       Q.  Would you agree there appears to be

20  reflection on the windows that are depicted in this

21  photograph?

22       A.  From this point of view, it looks that way,

23  yes.

24       Q.  From where you were standing, how far away

25  would you estimate the house was from where you were

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1   standing?

2      MR. KING:  So, I'm going to object as overbroad

3   as to scope, but you can answer.

4      THE WITNESS:  I don't know.  Twenty yards.

5   BY MR. YOUNG:

6      Q.  And so, you didn't go any closer to the

7   house to investigate; correct?

8      A.  Well, you do remember that I took a picture

9   from under the carport, right?

10     Q.  Right, but that wasn't depicting the house

11   I don't believe.

12     A.  You said to investigate.

13     Q.  Okay.  Fair enough.

14     A.  I didn't go --

15     Q.  Fair enough.  So, did you approach the

16   house any closer to investigate than where this

17   photograph was taken, to investigate the house?

18     A.  Did I go outside the fenced-in area, is

19   that what you're asking?  Or are you asking did I

20   make more steps further into the photograph and

21   stand under the carport, and maybe look from there?

22   What are you asking?

23     Q.  That's what I'm asking.  When you walked

24   further into the photograph underneath the carport,

25   did you look into the house from that vantage point?

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1      A.  Yes, I'm sure I did.

2        Q.  I'm sorry.  I'm sorry, that is not what I

3    meant to do.  I have to do these things in the right

4    order.  So, I'm showing you again the photograph

5    that was previously marked as Exhibit 10 to your

6    deposition testimony.  Can you see the photograph

7    again?

8        A.  Yes.

9        Q.  Okay.  So, when you took this photograph

10   from just outside the man door, approximately, how

11   many yards into the property were you?

12        MR. KING:  Okay.  So, I'm going to object as

13   overbroad as to scope, and calls for speculation as

14   to what you are requesting, but you can answer as

15   best you can, Mr. Smith.

16        THE WITNESS:  I would say it was 15 to 20 feet

17   where the fence would be, had it been there.

18   BY MR. YOUNG:

19        Q.  How about from the edge of the road, how

20   much --

21        A.  The house is set back.  The garage is set

22   back eight to ten feet from the edge of the road,

23   approximately.

24        Q.  Okay.

25        A.  Maybe less.  It could be seven to ten feet.

1      A.  Yes, I'm sure I did.

2        Q.  I'm sorry.  I'm sorry, that is not what I

3    meant to do.  I have to do these things in the right

4    order.  So, I'm showing you again the photograph

5    that was previously marked as Exhibit 10 to your

6    deposition testimony.  Can you see the photograph

7    again?

8        A.  Yes.

9        Q.  Okay.  So, when you took this photograph

10   from just outside the man door, approximately, how

11   many yards into the property were you?

12       MR. KING:  Okay.  So, I'm going to object as

13   overbroad as to scope, and calls for speculation as

14   to what you are requesting, but you can answer as

15   best you can, Mr. Smith.

16       THE WITNESS:  I would say it was 15 to 20 feet

17   where the fence would be, had it been there.

18   BY MR. YOUNG:

19       Q.  How about from the edge of the road, how

20   much --

21       A.  The house is set back.  The garage is set

22   back eight to ten feet from the edge of the road,

23   approximately.

24       Q.  Okay.

25       A.  Maybe less.  It could be seven to ten feet.

ANDREW SMITH Vol II
DECEMBER 07, 2021

JOB NO. 207320

1    I don't know.

2        Q.  When you went out to the property on

3    February 15, 2019, did you know if there was any

4    construction going on inside the barns that are

5    located on the property?

6        A.  That was just the report that we were told.

7    But without going out and going through the barns,

8    and being led there by the owner or a property

9    representative, I would have needed an inspection

10   warrant, so I didn't go there.

11       Q.  Did you think that you needed an inspection

12   warrant to go into the areas where you took the

13   photographs that we've been looking at?

14       A.  Well, if you're asking me whether or not I

15   had the right to be there, which I think is what you

16   are asking, I had the right to be there because

17   there was no gate in my way.  There was no completed

18   fence.  There was no no trespassing sign.

19           What I walked into is where there was a

20   fence being built, and then, there was an inner

21   fence.  Right.  And that inner fence, even though it

22   was broken, and I'm sure if someone wanted to or

23   needed to go through the fence, was a clear

24   delineator of this is the outer fence of the house,

25   and then, the other fence was being built.

1          But if I was a FedEx guy, if I was a UPS

2   driver, I would have been able to walk to that

3   point.  In fact, if I felt that I was going to gain

4   some assess to somebody at the front door, it was

5   open, I could have walked to the front door and

6   knocked on it, but I didn't because I didn't believe

7   that there was somebody there.

8          I asked the person in the garage, and he

9   said -- his answer was that there wasn't somebody

10   there, I don't remember what his words were, he

11   didn't need me to go to the house.  So, I did have

12   the right to be where I was at.  That's why I took

13   the photos from where I was at.

14      Q.  Back when you were at the property on

15   February 15, 2019, did a property owner need to get

16   a permit from the County, from your department, if

17   they wanted to paint the interior of a structure on

18   their property?

19      MR. KING:  Okay, so I'm going to object as an

20   incomplete hypothetical, overbroad, but you can

21   answer.

22      THE WITNESS:  No.

23   BY MR. YOUNG:

24      Q.  What about to tear out old carpet or wood

25   or linoleum or floor covering?

1      MR. KING:  Same objection.  You can answer.

2      THE WITNESS:  No.

3   BY MR. YOUNG:

4      Q.  What about to install new carpet or some

5   new floor covering?

6      MR. KING:  Same objection.  You can answer.

7      THE WITNESS:  No.

8   BY MR. YOUNG:

9      Q.  What about to install baseboard or door and

10  window trim?

11     MR. KING:  Same objection.  You can answer.

12     THE WITNESS:  Installing door and window trim on

13  existing doors or windows, no.

14  BY MR. YOUNG:

15     Q.  And what about if the property owner wanted

16  to remove a damaged cabinet from inside a structure

17  on their property, would that require a permit?

18     MR. KING:  Same objection.  You can answer.

19     THE WITNESS:  Not unless they were changing

20  electrical and plumbing.

21  BY MR. YOUNG:

22     Q.  Did you have any evidence when you were out

23  at the property on February 15, 2019 that there was

24  any electrical or plumbing work being done?

25     MR. KING:  Same objection.  You can answer.

1      THE WITNESS:  I had the information from the

2    original reporting party that the building was being

3    converted.  Wrapped in that is that in a garage,

4    there would be the addition of electrical or

5    movement of the electrical.  There would be the

6    addition of plumbing and installation of plumbing

7    fixtures.  In that, did I see those things?  No, I

8    did not.  But I had the information that was going

9    on.

10   BY MR. YOUNG:

11      Q.  Okay.  So, what about installing a new

12   cabinet to replace a damaged one?

13      MR. KING:  I believe you just asked that, but

14   I'm going to let him answer.

15      MR. YOUNG:  I did not ask him that question.  I

16   would like to ask my question fully before you

17   object.

18   BY MR. YOUNG:

19      Q.  What about installing a new cabinet to

20   replace the damaged one that was removed, would that

21   require a permit?

22      MR. KING:  Same objection.  You can answer.

23      THE WITNESS:  You did ask that question and I

24   did answer it.

25   BY MR. YOUNG:

1      Q.  No, I didn't.

2          A.  Okay, no, you don't need a permit for that,

3  but yes, you did ask that.

4          Q.  I asked you if you needed a permit to

5  remove a damaged cabinet.  Now I'm asking you about

6  installing a new one.  They are two different

7  questions.

8          A.  No.

9          Q.  Okay.  Thank you.  Let's take about, maybe,

10  a ten-minute break, and let me just look at my

11  notes, and we may be getting close to wrapping this

12  up.

13          MR. KING:  So, ten minutes would be a little bit

14  after 2:00.  So make it 2:05, sir.

15          THE WITNESS:  2:05.

16          MR. YOUNG:  Sure.

17          MR. KING:  Thank you, 2:05.

18          THE REPORTER:  We are off the record at 1:53.

19                    (Recess taken.)

20          THE REPORTER:  We are back on the record at

21  2:05.

22  BY MR. YOUNG:

23          Q.  I just have a few, sort of, final questions

24  for you, Mr. Smith, and then, I'll let you go.

25              Before I do that, we took a short break.

1    Do you wish to modify or add to any of your prior

2    testimony at this point?

3         A.  No, sir.

4         Q.  As we've been discussing this case today,

5    you've mentioned several times that there was a

6    reporting party that made a complaint about the

7    Arlington Avenue property.  So, I want to ask you,

8    at any point did you talk to the reporting party

9    that made the complaint?

10        A.  I don't recall doing that, no.

11        Q.  So, when you say you don't recall doing

12   that, are you saying you didn't do that, or you have

13   no memory of whether you did that or not?

14        A.  I don't recall doing that.  It doesn't mean

15   that I didn't, because on occasion I do talk to

16   reporting parties if the data is not clear enough,

17   but I don't recall doing that in this case.

18        Q.  If you had done that, would you have noted

19   that on any kind of writing?

20        A.  Yes, I would.

21        Q.  And what writing would you have done that?

22        A.  In my notes, in the Comment area.

23        Q.  So, that would be on the Comments that you

24   were talking about earlier?

25        A.  Yes.

1      THE WITNESS:  To the areas where I walked, I

2    didn't gain permission, because I didn't need it.

3    And I didn't go anywhere where I didn't already

4    testify.

5    BY MR. YOUNG:

6      Q.  When you were out at the property on

7    February 15, 2019, did you believe that there were

8    exigent circumstances at the property that would

9    make getting an inspection warrant unnecessary?

10      MR. KING:  I'm going to object as already been

11    covered in the prior deposition.  You can answer

12    again.

13      THE WITNESS:  There were no exigent

14    circumstances, no.

15    BY MR. YOUNG:

16      Q.  Are you satisfied that you've understood

17    all of my questions today?

18      MR. KING:  I'm going to object as argumentative

19    and compound.  You can answer.

20      THE WITNESS:  I wouldn't say all of your

21    questions.  I had to clarify a few, but I answered

22    the questions I understood.

23    BY MR. YOUNG:

24      Q.  And you've answered them to the best of

25    your ability?



A. SMITH - VOL II   12/07/2021

EXHIBIT
20
Theresa Bayle

Case 4:20-cr-03498-FJH   Document 91-4   Filed 12/01/21   Page 107 of 122



A. SMITH - VOL II   12/07/2021

**EXHIBIT**
**20b**
Theresa Bayle

# EXHIBIT "B"

## Cupp v. Smith

### 4:20-cv-03456PJH

1   ROBERT H. PITTMAN #172154
    County Counsel
2   MICHAEL A. KING, #77014
    County of Sonoma
3   575 Administration Drive, Room 105A
    Santa Rosa, California 95403-2815
4   Telephone:     (707) 565-2421
    Fax:           (707) 565-2624
5
    Attorneys for Defendant
6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9   RONALD CUPP                      )   CASE NO:  4:20-cv-03456-PJH
                                     )
10       Plaintiff,                  )   **DEFENDANT ANDREW SMITH'S**
                                     )   **RESPONSES TO REQUEST FOR**
11       vs.                         )   **ADMISSIONS; SET ONE**
                                     )
12  ANDREW SMITH, Individually;      )   Filed May 21, 2020
                                     )
13       Defendant.                  )
                                     )
14  _____      )

15  **PROPOUNDING PARTY:** Plaintiff RONALD CUPP

16  **RESPONDING PARTY**:   Defendant ANDREW SMITH

17  **SET NO.:**            ONE
18

19                       **INTRODUCTION**

20       Defendant ANDREW SMITH ("Defendant") hereby responds to the Request for

21  Admissions to Defendant; Set One propounded by RONALD CUPP ("Plaintiff") as follows:

22       This Responding Party objects generally to each of the requests to the extent that they

23  request information protected by any privilege, including, but not limited to, the attorney-client or

24  work product privilege, and any privacy rights.

25                    **RESPONSE TO REQUESTS**

26  **REQUEST  NO. 1:**

27       ADMIT YOU entered upon the SUBJECT PROPERTY on February 15, 2019.

28  //

_____

DEFENDANT SMITH'S RESPONSES TO          1
REQUEST FOR ADMISSIONS, Set No. 1

**RESPONSE TO REQUEST NO. 1:**

Objection, vague and ambiguous, calls for a legal conclusion; without waiving, admit based upon Defendant's understanding of the Request.

**REQUEST  NO. 2:**

ADMIT YOU did not have a warrant of any kind on you when YOU entered upon the SUBJECT PROPERTY on February 15, 2019.

**RESPONSE TO REQUEST NO. 2:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; without waiving, admit based upon Defendant's understanding of the Request.

**REQUEST  NO. 3:**

ADMIT YOU did not have Plaintiff's consent to enter upon the SUBJECT PROPERTY on February 15, 2019.

**RESPONSE TO REQUEST NO. 3:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; without waiving, admit based upon Defendant's understanding of the Request.

**REQUEST NO. 4:**

ADMIT YOU did not have any other person's consent to enter upon the SUBJECT PROPERTY on February 15, 2019.

**RESPONSE TO REQUEST NO. 4:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; without waiving, admit that he had no express permission based upon Defendant's understanding of the Request.

**REQUEST NO. 5:**

ADMIT there were no exigent circumstances at the SUBJECT PROPERTY at the time YOU entered the SUBJECT PROPERTY on February 15, 2019.

**RESPONSE TO REQUEST NO. 5:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; without waiving, admit based upon Defendant's understanding of the Request.

*//*

2

**REQUEST NO. 6:**

ADMIT that you did not have probable cause to enter upon the SUBJECT PROPERTY on February 15, 2019.

**RESPONSE TO REQUEST NO. 6:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; without waiving, deny based upon Defendant's understanding of the Request.

**REQUEST  NO. 7:**

ADMIT that YOU did not observe any activity occurring at the SUBJECT PROPERTY on February 15, 2019 that posed an imminent threat to the health and safety of any PERSON.

**RESPONSE TO REQUEST NO. 7:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; calls for speculation; without waiving, deny based upon lack of information and belief from Defendant's understanding of the Request.

**REQUEST NO. 8:**

ADMIT that YOU did not observe any condition at the SUBJECT PROPERTY on February 15, 2019 that posed an imminent threat to the health and safety of any PERSON.

**RESPONSE TO REQUEST NO. 8:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion; calls for speculation; without waiving, deny based upon lack of information and belief from Defendant's understanding of the Request.

**REQUEST  NO. 9:**

ADMIT that YOU did not observe any activity occurring at the SUBJECT PROPERTY that excused YOU from seeking a warrant prior to entering upon the SUBJECT PROPERTY

**RESPONSE TO REQUEST  NO. 9:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion.  Defendant refers to his responses to the prior Requests for Admission.

**REQUEST  NO. 10:**

ADMIT that YOU searched the SUBJECT PROPERTY on February 15, 2019.

//

3

**RESPONSE TO REQUEST NO. 10:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion.  Defendant refers to his responses to the prior Requests for Admission.

**REQUEST NO. 11:**

ADMIT that on February 15, 2019, Plaintiff had a clearly established constitutional right to not have his property subjected to unreasonable search by YOU pursuant to the Fourth Amendment of the U.S. Constitution.

**RESPONSE TO REQUEST NO. 11:**

Objection, vague and ambiguous, assumes facts not in evidence, calls for a legal conclusion.  Deny, based upon Defendant's understanding of the Request.

**REQUEST NO. 12:**

ADMIT the photographs (33 each) attached hereto as Exhibits A-AG are the only photographs YOU took of the SUBJECT PROPERTY at any time.

**RESPONSE TO REQUEST NO. 12:**

Objection, overbroad, vague and ambiguous, not relevant, not reasonably calculated to lead to discovery of admissible evidence.  Without waiving, admit that Defendant took photographs that appear to be attached as Exhibits A- AG.

**REQUEST NO. 13:**

ADMIT the photographs (33 each) attached hereto as Exhibits A-AG are true and authentic copies of the photographs YOU took of the SUBJECT PROPERTY.

**RESPONSE TO REQUEST NO. 13:**

Objection, overbroad, vague and ambiguous, not relevant, not reasonably calculated to lead to discovery of admissible evidence.  Without waiving, admit that Defendant took photographs that appear to be the photographs attached as Exhibits A- AG.

Dated: July 20, 2021                           ROBERT H. PITTMAN, County Counsel


By:____*Michael A. King*_____
       MICHAEL A. KING
       Deputy County Counsel
       Counsel for Defendant, ANDREW SMITH

4

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 575 Administration Drive, Room 105-A, Santa Rosa, CA 95403.

On July 20, 2021, I served the within documents:

**DEFENDANT ANDREW SMITH RESPONSES TO PLAINTIFF'S**
**REQUEST FOR ADMISSIONS, SET ONE**

☐   by transmitting via facsimile, the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒   by transmitting e-mail the document(s) listed above to the e-mail address set forth below on this date before 5:00 p.m.

☐   by placing the document(s) listed above in a sealed envelope for collection and mailing on that date following ordinary business practices.  I am readily familiar with the County's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U. S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.

☐   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Rosa, California addressed as set forth below.

☐   by causing personal delivery by _____ of the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by overnight delivery to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) set forth below.

| | |
|---|---|
| Ronald Cupp<br>150 Raley Town Center, Suite 25<br>Rohnert Park, CA 94928<br>ronc2009@gmail.com<br>roncupp.law.research@gmail.com | |

☒   I declare under penalty of perjury that the above is true and correct.

Executed on July 20, 2021, at Santa Rosa, California

/s/_____
Megan Sweeley

5

1
2

**VERIFICATION**

3

I, ANDREW SMITH, am the Defendant in this matter. I have read the DEFENDANT

4   ANDREW SMITH'S RESPONSES TO REQUESTS FOR ADMISSIONS, SET NO. ONE, and

5   know the contents thereof. I am informed and believe that the responses stated therein are true

6   and correct, and on that ground declare under penalty of perjury under the laws of the State of

7   California that the foregoing is true and correct to the best of my information and belief.

8       Executed on July 12, 2021, at Santa Rosa, California.

9
10
11                          Andrew Smith
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**EXHIBIT "C"**

**Cupp v. Smith**

**4:20-cv-03456PJH**

ROBERT H. PITTMAN #172154
County Counsel
MICHAEL A. KING, #77014
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
Telephone:     (707) 565-2421
Fax:              (707) 565-2624

Attorneys for Defendant
ANDREW SMITH

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RONALD CUPP | ) | CASE NO:  4:20-cv-03456-PJH |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S FURTHER** |
| | ) | **RESPONSES TO INTERROGATORIES** |
| vs. | ) | **SET ONE** |
| | ) | |
| ANDREW SMITH, Individually; | ) | Complaint Filed May 21, 2020 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PROPOUNDING PARTY:** Plaintiff RONALD CUPP

**RESPONDING PARTY**:    Defendant ANDREW SMITH

**SET NO.:**                ONE

## INTRODUCTION

Defendant ANDREW SMITH ("Defendant") hereby responds to the Interrogatories to

Defendant; Set One propounded by RONALD CUPP ("Plaintiff") as follows:

Defendant ANDREW SMITH is fully complying to the Interrogatories based upon his

personal knowledge and ability to provide responses.  Responses to contention interrogatories are

made in part based upon information not within his personal knowledge.  He objects generally to

each of the interrogatories to the extent that they request information protected by any privilege,

including, but not limited to, the attorney-client or work product privilege.

//

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1:

IDENTIFY each denial of a material allegation and each special or affirmative defense in YOUR pleadings and for each state:

(a) All facts upon which YOU base YOUR denial or YOUR special or affirmative defenses.

(b) IDENTIFY all PERSONS with knowledge that support YOUR denial or YOUR affirmative defenses.

(c) IDENTIFY all DOCUMENTS that support YOUR denial or YOUR affirmative Defenses.

### FURTHER RESPONSE TO INTERROGATORY NO. 1:

Defendant further responds without waiving his prior objections and responses.  The request is overbroad as to time and persons involved; and because it encompasses matters that are not relevant to the circumstances of events leading to and including the inspection by Defendant on February 15, 2019.  He again identifies his Answer to the First Amended Complaint as responsive to this Interrogatory.  He further identifies his deposition testimony as responsive to this Interrogatory.

(a)      In response to a complaint of construction without permit at a vacant property at 4640 Arlington Drive, Defendant determined that the owner was Federal National Mortgage. He sent a letter on January 29, 2019, to the owner of the Property requesting an inspection.  On February 15, 2019, he went to the Property, observed an unpermitted fence of excessive height, and lumber and tailings in plain view.  After announcing himself, he went to the open door of the garage, and briefly communicated with a worker inside who was installing flooring in the garage. After taking some photographs from the other side of the garage, Defendant posted Notice and Orders for unpermitted construction and left.  Defendant was engaged in his duties as a Code Enforcement Inspector, and entitled to qualified immunity and various state immunities, based upon his reasonable belief that unpermitted construction was being performed at 4640 Arlington Ave, Santa Rosa.  Mr. Cupp's claim for damages under state law was not timely.

2

(b)      Defendant Andrew Smith and the worker who has been identified by Plaintiff as Daniel St. Clair who may reside in El Prado, New Mexico per telephone discussion with Defense counsel's office:  at the cell phone number provided by Plaintiff.  Federal National Mortgage Assn was the owner on title on February 15, 2019, whose address is set out in the Deed attached to the Notice and Order, and the Courtesy letter dated January 2019.

(c)      Defendant again incorporates his production of documents by reference.

**INTERROGATORY NO. 8:**

IDENTIFY any policies and procedures of the County of Sonoma Permit Resources Management Department RELATING TO the taking, storing, cataloguing, logging, lodging, or preserving of any photographs taken of real property in the County of Sonoma, including the SUBJECT PROPERTY.

**FURTHER RESPONSE TO INTERROGATORY NO. 8:**

Defendant further responds without waiving his prior objections and responses.  The request is overbroad and not particularized as to time, it is not particularized to the events in this matter or pertaining to this Property; it encompasses matters that are not relevant to the circumstances of events leading to and including the inspection by Defendant on February 15, 2019.  Without waiving, his prior factual response, Defendant incorporates herein his response to questions at his deposition about what he did to take and store photographs from his February 15, 2019 inspection. He used an application on his iPad to stamp the date, then he uploaded the photographs to the Permit Sonoma computer.

**INTERROGATORY NO. 11:**

"Is your response to each request for admission served with this interrogatory an unqualified admission?   If not, for each response that is not an unqualified admission:

(a) state the number of the request;

(b) state all facts upon which you base your response;

(c) IDENTIFY each PERSON who has knowledge of those facts; and

(d) IDENTIFY all DOCUMENTS and other tangible things that support your responseand IDENTIFY the PERSON who presently has possession of the DOCUMENTS.

//

**<u>FURTHER RESPONSE TO INTERROGATORY NO. 11</u>:**

Defendant further responds without waiving his prior objections and responses.

**Request No. 6:**

(b) Based upon Defendant's understanding of this request, he had cause to enter the Property on February 15, 2019.  He incorporates herein his testimony in deposition taken on July 22, 2021, his supplemental response to Interrogatory No. 1 (supra), and the numerous documents produced to Plaintiff but particularly the photographs taken on February 15, 2019, for the facts on which he bases this response.

(c ) Defendant and the worker identified by Plaintiff as Daniel St. Clair

(d) All documents produced by Defendant, but specifically his notes in the "Comments", his photographs, the Notice and Orders posted on February 15, 2019, and Defendant's deposition.

**Request Nos. 7, 8,  9, and 10**

These requests are confusing and compound, and assume that such a determination needed to be made. Without waiving, the objections;

(b)  There was unpermitted building activity obvious at the site, in plain view and heard by Defendant.  The unpermitted construction activity by definition is a public nuisance. Sonoma County Code Section 1-7( e). The permit requirements dealing with building code violations, provide minimum standards to safeguard the life, limb and property and protect the public health, safety and general welfare and to provide regulations and control of those factors in the physical environment which exercise or may exercise a deleterious effect on this physical development, health and survival. Sonoma County Code Section 7-1.  Defendant further incorporates the facts set out in his deposition testimony and in further response to interrogatory no. 1 above.

(c)  Defendant and the worker, and presumably Plaintiff.

**Request No. 11**

This request is compound and confusing since it assumes that Plaintiff owned the Property, which he did not according to the title on record with the County Recorder. The request seems to assume that there was an unreasonable search. Those assumptions are denied based upon the facts and documents set out in response to Interrogatory No. 1, which is incorporated herein.

4

**Request Nos. 12 and 13**

These requests are overbroad since they reference photographs that are not related to the only relevant inspection in this case, pursuant to relating to issues in this case as set out in ECF #72, and the Court's prior Orders.  Defendant Smith produced photographs taken after the February 15, 2019, many of which are included in this request.


Dated:  October 18, 2021                    ROBERT H. PITTMAN, County Counsel


                                                    By:_*Michael A. King*_____
                                                        MICHAEL A. KING
                                                        Deputy County Counsel
                                                        Counsel for Defendant, ANDREW SMITH

5

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 575 Administration Drive, Room 105-A, Santa Rosa, CA 95403.

On October 29, 2021, I served the within documents:

### DEFENDANT'S FURTHER RESPONSES TO PLAINTIFF'S INTERROGATORIES -SET ONE

☐ by transmitting via facsimile, the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by transmitting e-mail the document(s) listed above to the e-mail address set forth below on this date before 5:00 p.m.

☐ by placing the document(s) listed above in a sealed envelope for collection and mailing on that date following ordinary business practices.  I am readily familiar with the County's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U. S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Rosa, California addressed as set forth below.

☐ by causing personal delivery by _____ of the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by overnight delivery to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) set forth below.

| | |
|---|---|
| Eric G. Young<br>Young Law Offices<br>411 Russell Avenue, Second Floor<br>Santa Rosa, CA 95403<br>eyoung@younglawca.com<br>jackie@younglawca.com<br><br>*Attorney for Plaintiff* | |

☒ I declare under penalty of perjury that the above is true and correct.

Executed on October 29, 2021, at Santa Rosa, California

/s/ *Megan Sweeley*
Megan Sweeley

6

1

**VERIFICATION**

2

3      I, ANDREW SMITH, am the Defendant in this matter. I have read the DEFENDANT'S

4  FURTHER RESPONSES TO INTERROGATORIES, SET NO. ONE, and know the contents

5  thereof. I am informed and believe that the responses stated therein are true and correct, and on

6  that ground declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct to the best of my information and belief.

8      Executed on October 15, 2021, at Santa Rosa, California.

9

10  _____

Andrew Smith

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28